Argued March 23; reversed May 9; rehearing denied May 31, 1939

## HAYNES ET AL. v. DOUGLAS FIR EXPLOITA-TION & EXPORT CO.

(90 P. (2d) 207, 761)

In Banc.

*Francis E. Marsh* and *Elliott B. Cummins*, both of McMinnville (Vinton, Marsh & Marsh, of McMinnville, on the brief), for appellants.

*William C. McCulloch*, of Portland (Teal, Winfree, McCulloch, Shuler & Kelley, of Portland, on the brief), for respondent.

BAILEY, J. This action was brought by the plaintiffs, Guy Haynes and E. J. Linke, doing business under the assumed name of L. H. L. Lumber Company, against Douglas Fir Exploitation & Export Company, a corporation, to recover a balance alleged due the plaintiffs

from the defendant on the purchase price of two carloads of ties sold by the plaintiffs to the defendant. From a judgment of involuntary nonsuit the plaintiffs appeal.

At the times herein referred to the plaintiffs were operating a sawmill in Yamhill county, and the defendant was engaged in buying and selling lumber and forest products for export purposes.

On April 17, 1934, the plaintiffs agreed to sell to the defendant 60,135 feet of rough fir ties for $746.58. The contract provided for "delivery at mill's option and expense, on barge and/or cars, F. A. S. vessel at S. P. open dock, Portland harbor, Ore., wharfage, if any, for a/c of mill. For export to Manchuria. Months of loading, May, 1934. Vessel M. S. 'Shikisan Maru'. Expected to be ready to load about May 7th or 8th." The only other provisions of the contract material to this litigation are the following clauses: "Loading dispatch: cargo to be delivered free to vessel's side and as fast as vessel can load during working hours. * * * Mill to prepay rail freight, consign cars to the Douglas Fir Exploitation & Export Co. on straight bill of lading for M. S. 'Shikisan Maru' at S. P. Open Dock, Portland Harbor, and send original and one copy of bill of lading to the Douglas Fir Exploitation & Export Co., Yeon Bldg., Portland, Oregon."

The amended complaint, after setting forth the agreement between the parties, contains the following allegations:

"That by general and uniform custom and usage prevailing in the lumber trade in western Oregon and particularly in Portland, Oregon, where lumber is shipped by rail for transshipment by water at Portland, Oregon, at the time of making said contract of sale mentioned herein, and then and for a long time prior

thereto known to and recognized by plaintiffs and defendant and all persons engaged in the buying, selling and shipping of lumber into Portland, Oregon, for transshipment by water, the terms of said contract, to wit, 'delivery at mill's option and expense on barge and/or cars F. A. S. vessel at S. P. open dock, Portland harbor, Oregon', means that the seller would ship said lumber by rail to Southern Pacific open dock over the Southern Pacific railroad, freight prepaid, and that upon arrival of said lumber by rail at the East Portland yards of the Southern Pacific Company at East Portland, Oregon, the said railroad company would notify the buyer of such arrival of said lumber and the said railroad company would spot said cars containing said lumber at the request of the buyer free of freight charges to the buyer alongside the vessel furnished by the buyer and designated in the contract or some other vessel designated and furnished by the buyer on the Southern Pacific open dock for the purpose of unloading said lumber for transshipment on vessel.''

The amended complaint then alleges that in compliance with the request of the defendant the plaintiffs shipped the ties in Southern Pacific freight cars; that the same arrived at the East Portland yards of the Southern Pacific Company in Portland May 16, 1934; that the defendant was notified by the railroad company on that date of the arrival of the cars; and that the railroad company requested the defendant to designate the place where the cars were to be spotted on the Southern Pacific open dock for unloading onto the ''Shikisan Maru'' or any other vessel that might be furnished by the defendant. It is further alleged that the defendant failed and neglected to furnish and have available the ''Shikisan Maru'' or any other vessel for loading on May 16, 1934, or at any other time until September 5, 1934, at which latter date the cars were, at the request of the defendant, placed and spotted by

the railroad company on its open dock within reach of tackle of the "Atlantic Maru", for transfer to that vessel; and that before the railroad company did, however, place those two cars on its open dock it demanded of the defendant demurrage which had accrued against the cars, amounting to $528. This amount was paid by the defendant and deducted from the purchase price of the ties agreed to be paid to the plaintiffs. The remainder of the purchase price, or $218.58, was remitted to the plaintiffs by the defendant. A copy of the written contract between the plaintiffs and the defendant is attached to and made a part of the amended complaint.

The answer admits the written contract between the parties and that the agreed price for the ties was as stated in the complaint, and further alleges:

"* * * that by said contract plaintiffs undertook at their expense to deliver said ties to defendant on cars F. A. S. vessel at S. P. open dock in the harbor at Portland, Oregon; that the letters F. A. S. as used in said contract in their context meant that plaintiffs without cost to defendant would deliver said ties to defendant by causing the cars containing said ties to be placed on S. P. open dock at Portland, Oregon, within reach of ship's tackle; that on or about May 15, 1934, plaintiffs loaded the ties mentioned in the amended complaint in two (2) railroad cars at Yamhill, Oregon, and placed said loaded cars in the control and possession of Southern Pacific Company as their agent for the transportation, handling and delivery thereof to the defendant on said S. P. open dock within reach of ship's tackle; that plaintiff's said agent remained in control and possession of said cars between May 16, 1934, and September 5, 1934, did not spot or deliver said cars or either of them on said S. P. open dock within reach of ship's tackle at any time between May 16, 1934, and September 5, 1934; that thereafter plaintiffs' said agent demanded payment by defendant to it of the

sum of . . . $528 for its services in the transportation, handling and delivery of said cars and refused to deliver said cars or either of them to defendant on said S. P. open dock within reach of ship's tackle until said payment should be made."

It is then alleged that the defendant thereupon paid the Southern Pacific Company the sum of $528 and by reason thereof and not otherwise procured delivery of the ties to itself at the Southern Pacific open dock; and that the defendant deducted the amount so paid from the purchase price of the ties and paid to the plaintiffs the balance of the purchase price, to wit, $218.58.

It is conceded by both the plaintiffs and the defendant that the $528 paid by the defendant to the Southern Pacific Company was the amount which the railroad company charged for demurrage from May 16 to September 5, allowing five days' free demurrage.

The respondent states that the only question here involved is: "Did the detention of these two cars under load on account of which Southern Pacific Company exacted $528 in demurrage take place while the cars were still in the possession of the appellants and before they were delivered to the respondent as contemplated by the contract?" Stated in another way, this is the question: Did the plaintiffs, on or about May 16, 1934, deliver the two cars of ties to the defendant substantially in accordance with the terms of the contract between them? If the cars were not delivered until September 5, when they were spotted by the Southern Pacific Company on its open dock, the judgment should be affirmed.

The record discloses that on April 30, 1934, the defendant notified the plaintiffs that the " 'Shikisan Maru' is now delayed and will not load at the S. P.

siding until about May 16." The two carloads of ties were shipped on May 15 by the plaintiffs, freight prepaid, and consigned to the defendant on straight bill of lading for the "Shikisan Maru" at the Southern Pacific open dock in Portland harbor, and these cars arrived in Portland on the Southern Pacific side track near the open dock May 16, 1934. On that day the railroad company notified the defendant of the arrival of the cars. These cars were kept on tracks adjacent to the dock, for placement at any time the defendant was ready for loading.

At the time the cars of ties were shipped, longshoremen and dock workers in Portland were on strike, which strike did not end until July 31, 1934. While it lasted no railroad cars were unloaded on the dock to any vessel. On September 5, 1934, at which time the "Shikisan Maru" was not available for loading, the "Atlantic Maru" was berthed at the open dock of the Southern Pacific Company, and representatives of the "Atlantic Maru" instructed the Southern Pacific Company to spot the two cars of ties on the Southern Pacific open dock alongside that vessel. Before spotting the cars, however, the Southern Pacific Company procured the approval of the defendant, for the reason that the "Atlantic Maru" was not the ship mentioned in the bill of lading.

Mr. Frank G. Smith, who had been in the employ of the Southern Pacific Company for 52 years and had been the freight agent of that company at its East Portland freight station since 1912, testified that the Southern Pacific open dock in Portland harbor is located north of Burnside street on the east side of the Willamette river in Portland, extending approximately 1,200 feet along the river front. He further testified

that this dock was not for storage. In answer to the question, "what is the usual custom or the general, customary manner of handling" cars which come into the East Portland yards for transshipment on vessels docked in Portland harbor, Mr. Smith stated:

"Cars as they come in are accompanied by the way bill on which is indicated the consignee, and in case of these export carloads of lumber, the port is indicated and the destination; in addition to that, ordinarily they are billed in care of the Southern Pacific open dock. On arrival they are placed on tracks adjacent to the Southern Pacific open dock, or, if the ship is not at the dock, they are placed on the order of the — on arrival they are placed alongside the ship in the order as designated by the supercargo who handles the loading of the ship. If the ship is not at the dock, they are placed on tracks adjacent to the dock, where they are available for placing on arrival of the ship, and on the order of the supercargo who loads the ships; he supervises the loading of the ship."

Mr. Smith further testified that the consignee is notified by telephone immediately upon the arrival of the car of export lumber, and that the railroad company has operated under that system for many years. He also stated that the Southern Pacific Company had previously handled shipments consigned to the defendant company in the same way that the two cars here involved were handled. He testified that these two cars of lumber were kept on tracks adjacent to the dock for placement, subject to being spotted on instruction from the consignee.

Mr. Lloyd J. Wentworth, who is the manager of the defendant company's Oregon district office in Portland and who was employed in that capacity at the time the contract in question was entered into, testified as follows:

"Q. What is the customary manner when you order a lot of cars in of lumber from outside mills to be shipped to export trade, what is the customary manner of you and the railroad company and the shipping crew in handling that lumber for export purposes? * * * A. We advise the mills of the time or the approximate time the ship is to arrive, and the mills send the cars in, consigned in care of the particular steamer, that is named for those particular cars; the ship arrives at S. P. open dock and orders the cars in to the ship as it wants the cars placed. The loading of the cars from the—taking of the lumber from the cars into the vessel, that is a service performed by the ship itself through its longshoremen employed by the ship. Does that answer it?

"Q. Yes; is it customary to notify the Douglas Fir of the arrival of the cars in Portland? A. It is customary? Q. Yes. A. Mr. Smith's office usually telephones the car numbers in to us.

"Q. He advises the ship, the supercargo of the ship? A. Practically all of our sales are made to what we call exporting firms. The exporting firm is the one that charters the ship or hires the space in a particular ship. Our contact is not with the ship, but with the buyer. Q. In the Orient? A. Where the buyer comes from. Q. All right, go ahead. A. The American buyer usually; we notify the American buyer that cars have arrived, and he, in turn, passes those car numbers on to the ship, I think that is the custom.

"Q. Was that true in this particular case with the L. H. L. Lumber Company? A. The notification of the L. H. L. Lumber Company? Q. Yes. A. I presume it was; yes, sir."

After testifying on cross-examination that the supercargo had control over spotting the cars alongside the ship and that the defendant, unless it was the charterer of a ship, had no authority to give directions as to where cars should be placed, Mr. Wentworth testified on redirect examination as follows:

"Q. The question I want to know is this: It is customary for the supercargo to make up a schedule as to how those cars—and in what order they have to be taken on and loaded into the ship, you have nothing to do with that, as I understand you to say, is that true? A. That is correct.

"Q. But who advises the supercargo the car numbers and what cars you wanted to load in the ship? * * * A. We advise our buyer, give him the car numbers, and the buyer, in turn, advises the ship.

"Q. Who advises you? A. We get the information from the mills."

The defendant takes the position that delivery of the two cars of ties was not made to it by the plaintiffs until the cars were spotted by the railroad company on its open dock in Portland harbor, September 5, 1934. It argues that, regardless of whether there was any vessel available for loading, it was the duty of the plaintiffs to see that those cars were placed on the open dock, and had that been done on May 16, when the cars arrived in Portland, the plaintiffs would fully have complied with all the terms of the contract relating to delivery of the ties.

Discussing this feature of the case, the defendant in its brief asserts:

"* * * The assumed neglect of the buyer to furnish a vessel may be laid aside as wholly immaterial in this case. The delivery contemplated by the contract was the spotting of these two cars of ties on S. P. open dock in the harbor at Portland, Oregon, within reach of ship's tackle and without cost to the buyer. Such delivery might have been made, although no ship lay alongside the dock at the time the cars were so spotted. If the sellers had made such a delivery, even though the Shikisan Maru or any other vessel had not been lying at the dock, the sellers would have completely performed their contract so far as delivery to the buyer

was concerned. Therefore, it is absolutely contrary to the facts for the appellants to argue as they do in their brief that it was 'impossible for the sellers to deliver f. a. s. vessel' because 'the buyer had neglected to furnish a vessel'."

The defendant in effect admits that the cars of ties were shipped by the plaintiffs and arrived in Portland in compliance with the provisions of the contract between the parties and the instruction given by the defendant to the plaintiffs in regard to shipment. It also virtually admits that the plaintiffs complied with that condition of the contract which required them to prepay the rail freight and cause the cars to be consigned to the defendant on a straight bill of lading for the "Shikisan Maru" at the Southern Pacific open dock, and that the plaintiffs sent or furnished to the defendant the original and one copy of the bill of lading.

The contract between the plaintiffs and the defendant is on the printed form of mill order of the defendant company. The first provision, to which attention is now directed, is printed, with the exception of typewritten insertions, here appearing in italics. It reads as follows: "Delivery at mill's option and expense on barge and/or cars, f. a. s. vessel at *S. P. open dock, Portland harbor, Ore.*, wharfage, if any, for a/c of mill." According to the pleadings of both plaintiffs and defendant, and the arguments contained in their respective briefs, the plaintiffs did not have any option as to the means of transportation. All the parties concerned state that the contract required the ties to be shipped by rail. This interpretation doubtless results from the provision at the end of the contract, in typewriting, which reads as follows: "Mill to prepay rail freight, consign cars to the Douglas Fir Exploitation &

Export Co. on straight bill of lading for M. S. 'Shikisan Maru' at S. P. open dock, Portland harbor''.

The plaintiffs and the defendant, however, differ in their construction of the term ''f. a. s.'' as used in the contract. In ordinary usage those letters mean ''free alongside ship''. The plaintiffs set forth what they contend is the meaning of that term, based on custom and usage, particularly in relation to the export of lumber from Portland harbor. The defendant, on the other hand, alleges and contends that the letters f. a. s. as used in the contract mean ''that plaintiffs without cost to the defendant would deliver said ties to the defendant by causing the cars containing said ties to be placed on S. P. open dock at Portland, Oregon, within reach of ship's tackle''. The position of the defendant is somewhat clarified in its brief by the assertion that the plaintiffs were required to have the cars of ties ''spotted'' on the Southern Pacific open dock for shipment, even though no vessel was available for loading ''at the time the cars were so spotted''.

■ In construing an agreement between parties the circumstances under which it was made, including the situation of the subject matter of the instrument and of the parties to it, may be shown, so that the court may be placed in the position of those whose language is to be interpreted: § 9-216, Oregon Code 1930; *Hurst v. W. J. Lake & Co.*, 141 Or. 306, 16 P. (2d) 827, 89 A. L. R. 1222. In the instant case, we find that the ties which were purchased by the defendant were for export trade and were to be transferred from freight cars on the Southern Pacific open dock in Portland harbor to a vessel. This open dock is approximately 1,200 feet long. Two vessels at a time can be tied up alongside it, and four freight cars can be unloaded simultaneously alongside each

vessel. The amount of cargo which each vessel can hold is much greater than four carloads. This open dock, as has already been stated, is not used for storage purposes, but only for transshipment.

■ This court, in *Simms v. Sullivan*, 100 Or. 487, 198 P. 240, 15 A. L. R. 678, observed:

"Valid usages, known to the contracting parties, concerning the subject matter of the agreement, or usages of which the parties are chargeable with knowledge, are by implication incorporated therein, unless expressly or impliedly excluded by its terms, and are admissible to aid in its interpretation, not as tending in any respect or manner to contradict, add to, take from, or vary a contract, but upon the theory that the usage forms a part of the contract."

See also, in this connection: *Hurst v. W. J. Lake & Co.*, supra; *Hurst v. W. J. Lake & Co.*, 146 Or. 500, 31 P. (2d) 168; 17 C. J. 492 and 499, §§ 58 and 62.

■ A proper construction of the contract in its entirety, in the light of the prevailing custom in respect to delivery of forest products in Portland harbor for transshipment by vessel, and the subsequent conduct of the parties, indicate that there was a delivery of the two cars of ties by the plaintiffs to the defendant when such cars were placed by the Southern Pacific Company on tracks adjacent and leading to the open dock. The evidence shows beyond doubt that it was the general practice and custom when forest products were shipped by rail, freight prepaid, and consigned to the buyer for transshipment, that the future movement of the cars after arriving on the above-mentioned tracks adjacent to the open dock was under the control of the purchaser or of the supercargo of the ship to which such forest products were to be transferred. And as to the

two cars here involved, it is clearly apparent that when the first vessel became available for transshipment it was the supercargo of that vessel who gave the order for spotting the cars alongside the ship. Inasmuch as the cars were consigned to the buyer, the seller no longer had any control over their movement after they arrived in Portland and the purchaser was notified of such arrival.

The freight charge that was prepaid covered not only transportation from Yamhill to Portland but also the spotting of the cars on the Southern Pacific open dock when requested by the defendant or the one to whom it had given that authority.

In the case of *Yoshizumi v. Platt Produce Company,* 43 Cal. App. 673, 185 P. 689, the plaintiff agreed to sell to the defendant 540 sacks of potatoes, which were to be delivered by the plaintiff, f. o. b. boat, at a designated place in San Joaquin county, California. No boat was furnished by the defendant. The potatoes were delivered on the wharf, ready for the boat. In an action brought by the plaintiff to recover the purchase price of the potatoes, the court held that the decisions ''seem to be quite uniform to the effect that proof of custom and usage is admissible . . . to prove that f. o. b. means on the wharf, ready for the boat.'' In support of this proposition the opinion cites and quotes somewhat extensively from the case of *Meyer v. Sullivan,* 40 Cal. App. 723, 181 P. 847, wherein was involved the construction of a contract requiring wheat to be delivered f. o. b. steamer. In the excerpt quoted from the latter decision it is pointed out that the fact that the parties to the action ''have come to such a vigorous disagreement over the meaning of the terms of the contracts is some indication that the court might be compelled to look to other

sources of information than the contracts themselves in order to arrive at a proper interpretation of the disputed point. That the evidence of usage and custom was properly considered by the trial court in determining the place of delivery of the wheat contemplated by the parties under the f. o. b. clauses of the contracts is borne out by the authorities.''

■ This court in *Hurst v. W. J. Lake & Co.*, 141 Or. 306, 16 P. (2d) 827, 89 A. L. R. 1222, in an opinion reviewing many adjudications, held that when members of a trade or business group have employed in their contract trade terms, they are entitled to prove that fact in litigation involving the contract, and show the meaning of the terms used, to assist the court in the interpretation of the language to be construed. In that case was involved the construction of a contract for the sale of horse-meat scraps which provided that such scraps should contain a minimum of 50 per cent protein. According to the usage prevailing in the group of people dealing in that commodity, 49.5 per cent or more protein was considered a substantial compliance with the requirement of 50 per cent. The annotation of the above case in 89 A. L. R., beginning at page 1228, contains many citations of cases in which evidence of trade custom or usage is held admissible for the purpose of assisting the courts to interpret contracts according to the intention of the parties.

Based upon the record before us, it is our opinion that the two cars of ties here involved were delivered by the plaintiffs and accepted by the defendant in Portland May 16, 1934, and that the trial court committed error in granting the defendant's motion for a nonsuit. The judgment appealed from is reversed and the cause re-

manded to the circuit court with directions to set aside the judgment and grant a new trial.

BELT, J., not sitting.

LUSK, J., not participating in the consideration of this case.

***

Petition for rehearing denied May 31, 1939

ON PETITION FOR REHEARING

(90 P. (2d) 761)

BAILEY, J. In a petition for rehearing the defendant asserts that the contract for delivery of two carloads of ties by the plaintiffs to the defendant was definite, certain and unambiguous, and therefore needs no interpretation. Giving its version of that part of the contract material to this appeal, the defendant in its brief accompanying the petition states: "Delivery was to be on cars 'at S. P. open dock, Portland harbor, Oregon.'" In attempting to explain what is meant by "at S. P. open dock, Portland harbor, Oregon", the defendant argues that the contract provided for delivery of the ties "on" the Southern Pacific Company's open dock and that the cars had to be "spotted" on that dock in order to effect such delivery. The rest of the contract is virtually ignored by the defendant, and the term "f. a. s." no longer appears to be, in its opinion, of any importance.

■ As stated by the defendant, the contract did provide for delivery of the cars of ties "at" the Southern Pacific open dock, but it did not require that the cars be delivered "on" the Southern Pacific open dock or that they be "spotted" there.

In our former opinion we pointed out the location of the Southern Pacific open dock in Portland; that the cars were, as requested by the defendant, consigned to it on straight bill of lading for the "Shikisan Maru"; that the cars were delivered on the day appointed, on tracks adjacent and leading to the open dock; and that the defendant was immediately notified by the Southern Pacific Company of the arrival of the cars there. It was also pointed out that the Southern Pacific open dock was used exclusively for loading, and that the supercargo, when ready to load, notified the Southern Pacific Company to have designated cars brought alongside the vessel.

The word "at" is defined by Webster's New International Dictionary thus: "Primarily, *at* expresses the relation of *presence or contact in space or time* or of *direction toward*. It has much the sense of *to* without its implication of motion, and is less definite than *in, on, by*, etc." One of the definitions given by Funk & Wagnalls is: "In proximity to; in the vicinity or region of; close to; by; near". "At" has been judicially defined as meaning *by* or *near*: *Kitchel v. Gallagher*, 126 Or. 373, 379, 270 P. 488; *Goninon v. Lee*, 119 Wash. 471, 206 P. 2. Its signification depends largely upon the subject matter in relation to which it is used and the circumstances under which it is applied: *Smeltzer v. Atlanta Coach Co.*, 44 Ga. App. 53, 160 S. E. 665. The word "at" is less definite than *in* or *on*: *Lovin v. Hicks*, 116 Minn. 179, 133 N. W. 575; *Waynesville v. Satterthwait*, 136 N. C. 226, 48 S. E. 661.

In railroad parlance, to "spot" a car is to place it for either loading or unloading: *Missouri Pacific R. Co. v. Skipper*, 174 Ark. 1083, 298 S. W. 849. It is therefore difficult to understand how the two cars here

in question could be spotted on the Southern Pacific open dock when there was no vessel there onto which the ties could be unloaded.

■ Testimony as to the general custom and usage prevailing in Portland harbor relative to shipment of lumber products to that port for transshipment was competent not only to explain what was meant by the term ''delivery at S. P. open dock'', but also, as stated in our former opinion, to show what was understood by the term ''f. a. s.'' as used in connection with the other language appearing in the contract between the parties.

In the brief accompanying the petition for rehearing, the defendant, in referring to the supercargo's ordering the cars of ties to be spotted on the open dock, states that the plaintiffs ''certainly had as much authority in this respect as they conferred on the supercargo''. We also find in that brief the following: '' 'The future movement of the cars after arriving' on 'tracks adjacent to the open dock' was unquestionably subject to 'the control' of the appellants [plaintiffs]. If it was not, from what other source did the right of such control on the part of the ship's supercargo spring?'' In answer to that question propounded by the defendant, attention is directed to the testimony of Mr. Wentworth, manager of the defendant company, set forth in our former opinion, to the effect that upon the arrival of the cars in Portland the purchaser notifies the exporting firm of that fact, and the latter firm gives the numbers of the cars to the ship. In ordering the cars spotted alongside the vessel, the supercargo, therefore, is not the agent of the seller, nor does he receive authority from the seller to spot the cars. It is by virtue of what is done by the buyer, in

this instance the defendant, that the supercargo derives his authority to direct the further movement of the cars.

When the cars arrived on the tracks adjacent and leading to the open dock there was in fact, within the contemplation of the parties to the contract, a delivery of the cars by the plaintiffs to the defendant. The petition for rehearing is denied.

BELT and LUSK, JJ., not participating.