Argued June 23, affirmed in part; reversed in part
November 11, 1971

# GEORGE, *Respondent, v.* SCHOOL DISTRICT No. 8R OF UMATILLA COUNTY, *Appellant.*

490 P2d 1009

*Alex M. Byler,* Pendleton, argued the cause for appellant. With him on the briefs were Rustin A.

Brewer, Donald G. Morrison, Hermiston, and Corey, Byler and Rew, Pendleton.

*Richard L. Haeder,* Portland, argued the cause for respondent. On the brief was Gene B. Conklin, Pendleton.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

SCHWAB, C. J.

This is a proceeding for declaratory relief under ORS ch 28 initiated by plaintiff, a high school teacher, against the defendant school district to determine plaintiff's rights under his employment contract. Numerous issues are raised, all revolving around the central question of whether the school district can reduce plaintiff's salary by $2,000 by relieving him of his "extra duty" position as football coach after one year of a three-year contract. The trial court ruled in plaintiff's favor, and defendant appeals.

Plaintiff was first employed by the defendant school district as a math teacher and football coach in 1962. During the 1962-63, 1963-64, and 1964-65 academic years plaintiff had a series of one-year contracts. In 1965 he was granted a three-year contract as the school district was required to do. *See,* ORS 342.508 (1), which covers teacher contracts in districts such as the defendant with an average daily membership over 800 pupils, but not subject to the Fair Dismissal Law, ORS 342.805 to 342.955, *as amended,* Oregon Laws 1971, ch 570, formerly known as the Teacher Tenure Law.

In 1968, plaintiff was granted another three-year

contract, which is the basis of the present litigation. The 1968 contract provided, in pertinent part:

"TEACHER'S CONTRACT

"THIS AGREEMENT made this 22nd day of April, 1968, by and between School District No. 8R of Umatilla County, Oregon, hereinafter referred to as the district and Robert George, hereinafter referred to as the teacher.

"WITNESSETH:

"1. The district agrees to employ the teacher for a period of 3 year(s), commencing on the first day of July, 1968, and ending on the 30th day of June, 1971, and to pay the teacher therefor an annual salary of $11,300.00, together with any compensation programs established by the district.

"2. In consideration of the compensation paid hereunder, the teacher agrees to teach Secondary grades in the schools of the district during the period of the regular school year as established by the district * * *.

"* * * * *

"5. Additional terms of the contract are as follows:

| | |
|---|---|
| Base Salary 1968-69 | $ 9,300.00 |
| Extra Duties: Athletics | 2,000.00 |
| Total Salary 1968-69 | $11,300.00" |

Plaintiff continued to teach math and coach football during the first year of this contract, the 1968-69 academic year. The present dispute was sparked in the middle of that year when the school board became concerned over plaintiff's abilities as a football coach. During the seasons he had held that position (1962 through 1968) the teams coached by plaintiff compiled a won 21, lost 37 record. The earlier years during that period must have been reasonably

successful; the last two years were not, with records of 0-9 (1967) and 2-6 (1968).

Considering this record and other information, the school board decided plaintiff should join the ranks of other losing coaches in retirement, and, accordingly, fired him from his position as football coach in February of 1969.

At first apparently nothing was said about whether this action would have any effect on plaintiff's salary. Then some time in March of 1969, plaintiff received a mimeographed form entitled, "Notification of Teachers" informing him that his salary for the 1969-70 academic year would be $2,000 less than would have otherwise been the case because of the elimination of his "extra duty" of football coaching. Such forms are used in the defendant school district to confirm that a teacher plans to return for the coming year, and to inform a teacher of his salary for the coming year. The form requires a teacher to indicate his or her acceptance, and to sign.

Plaintiff modified the form he received by stating that his acceptance was conditioned on receiving the additional $2,000 in salary, which, in the modified form, he claimed he had a right to under his contract. The school board treated such action as a refusal to teach, declared plaintiff's teaching job open, and subsequently filled it with another person. The present litigation followed.

The parties agree that they entered into some kind of contractual relationship on April 22, 1968, whereby plaintiff was to work for defendant in some capacity for the three following school years. They agree on nothing else. They dispute the terms of the contract, each party claims the other is in breach, and they disagree as to the available damages.

As to the terms, plaintiff's theory is that he had a single indivisible contract to perform whatever teaching and whatever athletic duties the school board should assign him for an annual salary of not less than $11,300, plus "compensation programs established by the school district," i.e., plus salary increases. He does not question the authority of the school board to modify his teaching or athletic duties, or, for that matter, entirely relieve him of the football-coach position. But he insists the school board cannot, by changing his duties, reduce his salary during the term of the contract.

Defendant's theory is that there were two separate and divisible contracts embodied in a single writing on April 22, 1968. One was a three-year contract to teach for $9,300, plus any raises. The other was a one-year contract to coach football for $2,000. Thus, defendant's theory concludes, the school board was justified in not renewing the severable coaching contract which had the effect of reducing plaintiff's salary.[1]

■■ Whether a contract is divisible depends on the intention of the parties. *Pettigrove v. Corvallis Lbr. Mfg. Co.*, 143 Or 33, 35, 21 P2d 198 (1933). Such intent is determined primarily through construction or interpretation of the contract. Looking to the contract here in question, it does not appear on its face to be divisible. The first paragraph unequivocally states plaintiff is to be employed for a period of three years at a salary of not less than $11,300. The fifth para-

---

[1] Defendant consistently uses the terms "teaching" and "coaching" as though they were completely unrelated activities. Although for convenience we have also used these separate terms, we note in passing that they are not necessarily as distinguishable as defendant suggests. It could reasonably be said that a high school football coach is a "teacher" of football.

graph breaks down plaintiff's salary into "base salary" of $9,300 and compensation for "extra duties: athletics" of $2,000. But nothing in the fifth paragraph suggests that the "extra duties" compensation will be paid for any period less than three years. Therefore, the intention of the parties as expressed in the contract is fully in accord with plaintiff's theory and the trial court's decision, that is, that the contract was not divisible.

Besides the contract, the parties introduced substantial additional evidence. The admissibility of this evidence can be supported on two theories. First, the parts of it actually relating to the making of the contract are admissible as surrounding circumstances to be considered in interpreting the contract. ORS 42.220; *Card v. Stirnweis,* 232 Or 123, 374 P2d 472 (1962). Second, most of this evidence, which related to past practices and policies concerning contracts in the defendant school district, would be admissible to show custom and usage, which is also relevant in interpreting a contract. *See,* e.g., *Haynes v. Douglas Fir E. & E. Co.,* 161 Or 538, 90 P2d 207, 90 P2d 761 (1939).

All of this evidence must be evaluated by the same standard as the contract itself, that is, does it establish that it was the intention of the parties to make a divisible contract. *Pettigrove v. Corvallis Lbr. Mfg. Co.,* supra.

The surrounding circumstances evidence, ORS 42.220, indicated that the contract was not intended to be divisible. The minutes of the school board meeting at which plaintiff's contract was authorized indicate the contrary. After discussing plaintiff's performance as both a teacher and coach, the board voted to offer him the three-year contract here in question. Significantly, at that same meeting the teaching contract of

the then incumbent basketball coach, Mr. DeLap, was renewed for three years, while renewal of his basketball coaching contract was tabled at that time. At a later meeting Mr. DeLap's coaching contract was renewed for one year only. Comparing plaintiff's situation with Mr. DeLap's suggests that since plaintiff's teaching and coaching were discussed together and voted on together, the true intent at that time was to give him a single three-year contract covering both.

■ Custom and usage can be considered in interpreting a contract because both parties are assumed to have contracted with relation to it. *See, generally,* Restatement, Contracts 345-56, §§ 245-249. Parties are bound by custom and usage when they knew of it at the time of contracting or had reason to know of its existence and nature. *See, Haynes v. Douglas Fir E. & E. Co.,* supra. The burden of establishing custom and usage is on the party asserting it. Restatement, Contracts 349, § 247.

To establish custom and usage, a parade of school officials, testifying for the defendant, stated they had always thought any teacher's extra duty assignments could be changed annually, notwithstanding the remaining term of his or her teaching contract. The plaintiff's witnesses agreed that extra duty assignments could be changed and had been changed, but insisted this was always done either with the teacher's consent, or in a way that resulted in no net reduction in the teacher's salary during the remaining term of the contract. Thus, the critical question became whether there was a custom of changing a teacher's extra duty assignments in the middle of a contract, against the wishes of the teacher, in a way that resulted in a lower salary for the balance of the contract.

■ The defendant's case failed to prove the existence of such a custom. The closest it ever came was the following testimony of Superintendent of Schools Larive:

"Q Have there been during the years that Mr. George was with the District instances where the District—that is, the administration—asked certain of its employees to change their extra duty activities?

"A Yes, there have been.

"* * *

"Q Has that been a matter of mutual consent or mere acquiescence so far as you have observed?

"A Most of the time by mutual consent but there have been times when it has been the other way.

"Q By 'the other way,' what do you mean?

"A For instance, when Mr. Holt was shifted from the track program over to the instructional materials center we asked him to give up the assistant track coaching.

"Q Was he unwilling to do so?

"A He didn't want to, but that was part of the proposition that we made to him.

"Q Was this in the middle of his contract?

"A Yes, it was.

"Q Did that alter, then, the amount that he received under his contract?

"A I can't answer that specifically because I don't remember what his new salary was; but it did take away the assistant coaching salary."

This testimony fails to establish there was a custom of changing extra duty assignments in the middle of a contract, against the wishes of a teacher, resulting in a lower salary for the balance of the contract. There is no indication that Mr. Holt's consent was not event-

ually gained to the entire "proposition." Furthermore, all that we learn from this testimony is that Mr. Holt lost his extra duty salary as assistant track coach, and, we infer, gained a new extra duty salary for work in the "instructional materials center"; there is no showing that he ended up with a lower salary for the balance of the contract.

At most, all the defendant's evidence established was that the school board's intention may have been as they now claim—to give plaintiff a three-year teaching contract and a one-year coaching contract. But this case cannot be resolved on the basis of one party's subjective, unexpressed intent. If this remains the school board's desire in the future, there is no reason why they cannot explicitly put it in every contract, assuming teachers would be willing to bargain on those terms.

However, looking at the present contract, the surrounding circumstances, and the evidence concerning custom and usage, we conclude that as presently written, the contract is not divisible. Plaintiff's extra duty assignment and salary could have been changed at any time with mutual consent. Even in the absence of assent, the school board could change plaintiff's extra duties. However, it could not change his duties and thereby reduce his salary.

The only Oregon case we have found dealing with the divisibility of an employment contract is *McGilchrist v. F. W. Woolworth Co.*, 138 Or 679, 7 P2d 982 (1932). What was said in *McGilchrist* is our conclusion in this case:

> "* * * [I]t was not the intention of [all] the parties that these covenants should be considered as separate, distinct, and unrelated. The work

which plaintiff performed was in consideration of the entire agreement and his rights are not to be determined by looking solely to one of the covenants therein. * * *" 138 Or at 688.

■ The next question concerns which party breached the contract. The answer follows automatically from the interpretation of the contract we have adopted. The defendant's insistence that plaintiff accept a $2,000 salary reduction for the remaining two years of his three-year contract was a material breach of the entire contract. By refusing to acquiesce in this salary reduction, plaintiff was merely protecting his rights under the contract.[②]

Having concluded that there was a valid indivisible contract, and that the school board breached, we turn now to the damages problems. The trial court, reaching its decision in July of 1970, ordered that plaintiff be reinstated for the last year of the contract, the 1970-71 academic year, and awarded money damages for the 1969-70 academic year. On appeal, the defendant argues the trial court erred in ordering reinstatement, and that the money damages were excessive because of an improper application of the mitigation rule.

We begin our consideration of the reinstatement problem by making it clear we understand the issue to be whether plaintiff is entitled to reinstatement to his *teaching position* at the full contract salary, and not

---

[②] The trial court rejected the argument that plaintiff's performance as a football coach was so inadequate as to amount to a breach of the contract, concluding:

"The record, by an overwhelming preponderance of the evidence, establishes that the plaintiff was a good coach and probably an excellent one."

There is ample evidence in the record to support this finding.

whether he is entitled to again perform his prior coaching duties, or any other specific duties.

In Oregon, hiring of all teachers is governed by the same provision:

"* * * [T]he district school board, at a general or special meeting called for that purpose, may hire teachers and shall record such action in the minutes. The board shall make contracts with teachers that specify the wages, number of days to be taught and time employment is to begin, as agreed upon by the parties. The board shall cause the signed contracts to be filed in the office of the district school board and shall provide each teacher with a copy of the contract. If, however, the contract is for a term longer than one year, the method by which the wages are to be arrived at during the term of the contract may be specified." ORS 342.505 (1).

However, the amount of job security that a teacher then enjoys varies from one school district to another, depending on the size of the school district. School districts with an average daily pupil attendance in excess of 4,500 must comply with the Fair Dismissal Law, ORS 342.805 to 342.955, *as amended,* Oregon Laws 1971, ch 570, formerly known as the Teacher Tenure Law. In such a district, after a teacher has been employed on annual contracts for a probationary period of three years, he or she becomes a "permanent teacher" as defined in ORS 342.815 (5), *as amended,* Oregon Laws 1971, ch 570, Section 12. Thereafter, the "permanent teacher" can only be discharged for the reasons and through the procedures provided in the Fair Dismissal Law.

Those districts, such as the defendant here, with an average daily pupil attendance between 800

and 4,500, must comply with ORS 342.508 (1). This section provides, in effect, for a three-year probationary period with annual contracts, just as in a Fair Dismissal district. After three years of annual contracts, a teacher who is rehired must thereafter be given three-year contracts. During the term of these contracts, the teacher can only be discharged for the causes enumerated in ORS 342.530.

The contrast between the different teacher job-security rules in these different sized school districts comes down to this: in a Fair Dismissal district, after three years a teacher has permanent job security, that is, can only be dismissed in accordance with the Fair Dismissal Law; in a district, such as defendant, governed by ORS 342.508, after three years a teacher's job security comes in three-year intervals. Although the teacher must be granted a three-year contract, ORS 342.508, and can only be discharged for certain reasons during the term of the contract, ORS 342.530, at the end of each three-year contract the school board could decline to renew the contract for any reason.

This analysis could lead easily to the conclusion that a teacher wrongfully discharged by a Fair Dismissal school district would be entitled to permanent reinstatement, and a teacher wrongfully discharged by a smaller school district would be entitled to reinstatement for the balance of his or her contract, but no longer. This conclusion would support the action of the trial court in the instant case.

In support of ordering the plaintiff reinstated, the trial court cited the following:

"A teacher or other similar employee of a school organization who by virtue of a positive statutory provision has a fixed tenure of office or can be re-

moved only in a certain manner prescribed by statute is entitled to reinstatement if he has been removed from his position in violation of his statutory rights. * * *" 78 CJS 1125, Reinstatement § 217.

An examination of the cases from various jurisdictions in support of this passage shows that the statutory schemes in most states, unlike the Oregon scheme, provide only "permanent tenure," which in Oregon is confined to large districts. They do not contain provisions for "limited tenure" in smaller districts as does ORS 342.508 (1). Nor do they generally contain explicit requirements for reinstatement. Rather, the courts of those states have determined that the right to reinstatement flows from the permanent tenure provisions of the statutes.

In the case at hand the problem is further complicated by additional provisions of the relevant statutes. The Fair Dismissal Law, unlike the statutes governing the defendant, explicitly provides for reinstatement:

"Whenever a district superintendent has reason to believe that cause exists for the dismissal of a permanent teacher on any ground specified in paragraphs (b) to (f) of subsection (1) of ORS 342.865, and when he is of the opinion that immediate suspension of the teacher is necessary for the best interest of education in the district, he may suspend a permanent teacher from his position without prior notice to the teacher. The teacher's salary shall continue during the first five days of the suspension period. However, within five days after such suspension becomes effective, either procedures shall be commenced for the dismissal of the teacher pursuant to the provisions of ORS 342.805 to 342.955 or the teacher must be reinstated." Oregon Laws 1971, ch 570, p 1014.

"(6) If the Fair Dismissal Appeals Board finds that the facts relied on to support the recommendation of the district superintendent are untrue or unsubstantiated, or if true and substantiated, are not adequate to justify the statutory grounds cited as reason for the dismissal, and so notifies the permanent teacher, the district superintendent, the district school board and the Superintendent of Public Instruction, the teacher shall be reinstated and the teacher shall receive his salary for the period between the effective date of the dismissal and the date of the order reinstating him. If the teacher was suspended prior to the effective date of dismissal, he shall also receive his salary for the uncompensated period of the suspension." Oregon Laws 1971, ch 570, p 1017.

Both parties have assumed that these provisions authorize or require reinstatement as a judicially available remedy. We note, however, that the only reinstatement mentioned in these statutes is by administrative, not judicial action. But for present purposes, we will assume that reinstatement by judicial action would be appropriate following a wrongful discharge from a Fair Dismissal district.[9]

There is explicit mention of possible judicial remedies in the case of wrongful discharge from a district such as defendant. ORS 342.530 (2) provides:

"Before the district school board enters an order dismissing a teacher, it shall give the teacher written notice of the charges against him and an opportunity to be heard in his own defense in person or by attorney. However, for a breach of con-

---

[9] When faced with a civil service statute concerning firemen that only mentioned administrative reinstatement, we held the statute also authorized court-ordered reinstatement. Myers/Sherwood v. Tualatin RFD, 5 Or App 142, 483 P2d 95 (1971).

tract of teaching, the teacher or the district shall have their ordinary legal remedies."

The meaning of this section is not self-apparent. The first sentence discusses the administrative procedures to be followed in a teacher dismissal case. So in this context, the second sentence's reference to "ordinary legal remedies" could be construed to mean simply that the teacher could seek judicial review of the administrative action and not as indicating the nature of the remedy.[4]

Or, as the defendant here insists, "ordinary legal remedies" could mean that the wrongfully discharged teacher was limited to money damages, which is the ordinary remedy for breach of an employment contract.

We have found no Oregon cases on point. *But, cf., Stowe v. School Dist. No. 8-C,* 240 Or 526, 402 P2d 740 (1965). And cases in other jurisdictions are of little help, because they are all based on different statutory schemes controlling teacher personnel matters.

---

[4] This possible interpretation finds some support by an analogy to the parallel provisions of the Fair Dismissal Law, ORS 342.805 to 342.955, *as amended,* Oregon Laws 1971, ch 570, formerly known as the Teacher Tenure Law.

After describing the administrative procedures that must be followed to discharge a permanent teacher, that statute provides:

"Nothing in ORS 342.805 to 342.955 precludes a permanent teacher or a district school board from obtaining a writ of review as provided in ORS 34.010 to 34.100 after a hearing pursuant to this section for the purpose of reviewing the findings and order, if any, of the Fair Dismissal Appeals Board." ORS 342.905 (8), *as amended,* Oregon Laws 1971, ch 570, Section 8 (8).

This is merely a confirmation that jurisdiction exists to judicially review administrative action concerning a teacher discharge. The second sentence of ORS 342.530 (2), discussed above, could be interpreted to mean nothing more.

■ We have concluded that the balance tips toward the defendant's position, that is, that reinstatement is not an available remedy for a teacher wrongfully discharged from a school district governed by ORS 342.508, 342.513, and 342.530. In such a situation the teacher who is the victim of a breach of contract by a school board can always recover money damages. Money damages are relatively simply determined in the case of a contract of limited duration as distinguished from one covering a great span of years. In the absence of clearer guidance from the legislature, we conclude that the right to recover damages is a remedy that amply protects the teacher's reputation and finances. It follows that the trial court erred in ordering reinstatement in this case.

The final problem concerns the amount of money damages awarded by the trial court. Defendant argues this amount was excessive due to an erroneous application of the mitigation rule.

Under the mitigation rule, the victim of a contract breach must attempt to minimize his losses, and cannot recover damages for any losses that were avoidable. As applied to employment contracts, this usually means the employe who is the victim of a breach must seek other employment. *See, Rockwell v. School Dist. No. 1,* 109 Or 480, 220 P 142 (1923).

After plaintiff and defendant severed relations at the end of the 1968-69 academic year, plaintiff worked for a Reedsport school district as a substitute teacher during the 1969-70 academic year. In this capacity, plaintiff earned a little more than $4,000 for the year. Plaintiff was offered a contract by the Reedsport district under which he would have earned about $13,000, but did not accept it.

Defendant argues plaintiff's money damages should have been the difference between the amount he would have earned from defendant and the amount he could have earned under the offered Reedsport contract. Plaintiff argues, and the trial court concluded, that under the facts of this case money damages should be the difference between the amount plaintiff would have earned from defendant and the amount he did earn in Reedsport.

Plaintiff testified that he did not accept the contract offered by the Reedsport school district because he was then suing the defendant for reinstatement, and, therefore, believed he had to be available and able to perform his contract with the defendant. The defendant's brief concedes this was a justifiable reason for plaintiff's rejecting the Reedsport contract, stating, "accepting that other contract would have constituted a waiver of his demand for reinstatement." We agree.

However, the defendant's brief next argues that if we hold plaintiff is not entitled to reinstatement, then defendant's mitigation formula must be applied. We do not agree.

In the absence of any real guidance in statutory or prior case law, plaintiff was forced to make a hard choice in protecting his rights under the contract. He chose to seek reinstatement. Although we have held plaintiff is not entitled to reinstatement, we have also made it clear that this issue is a difficult and close one. Thus, we cannot say that the course of action chosen by plaintiff was unreasonable.

■ This being the case, plaintiff was entitled to his day in court on the reinstatement question; his duty to mitigate did not go so far as requiring him to accept

another teaching contract which could have resulted in a waiver of his claim for reinstatement. The plaintiff cannot recover for losses that could have been avoided "without undue *risk*, expense, or humiliation." Restatement, Contracts 535, § 336 (1). (Emphasis supplied.) To have accepted the Reedsport contract would have been an unreasonable risk for plaintiff to the extent that so doing could have jeopardized his claim for reinstatement in this case.

There is ample evidence to support the trial court's finding that plaintiff's efforts to mitigate the consequences of the defendant's breach of contract were reasonable under all the circumstances. The trial court's award of money damages was in the proper amount.

Affirmed in part; reversed in part.