682 F.2d 1326
 3 Employee Benefits Ca 2025
 ICN MEDICAL LABORATORIES, INC. EMPLOYEES' PROFIT SHARING
PLAN, Plaintiff-Appellant/Cross-Appellee,
v.
ICN MEDICAL LABORATORIES, INC., nka ICN Pharmaceuticals,
Inc., and ICN Pharmaceuticals, Inc.,
Defendants-Appellees/Cross-Appellants.
 Nos. 81-3496, 81-3508.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 4, 1982.
Decided July 26, 1982.
 
 Richard A. Wyman, Portland, Or., for plaintiff-appellant/cross-appellee.
 William C. Martin, Martin, Bischorf, Templeton, Biggs & Ericsson, Portland, Or., argued for defendants-appellees/cross-appellants; David P. Templeton, Martin, Bischoff, Templeton, Biggs & Ericsson, Portland, Or., on brief.
 Appeals from the United States District Court, District of Oregon.
 Before KILKENNY, GOODWIN and POOLE, Circuit Judges.
 KILKENNY, Circuit Judge:
 
 
 1
 ICN Medical Laboratories, Inc. and ICN Pharmaceuticals, Inc. (the LABS) appeal from a district court judgment awarding ICN Medical Laboratories, Inc. Employees Profit Sharing Plan (the Plan) $2.9 million as the balance due on a.$3.2 million property sale agreement between the parties. The LABS also appeal the court's award to the Plan of $826,734.00 in rent payments for leases between the LABS and the Plan for the period 1968-1973.
 
 BACKGROUND
 
 2
 In 1961, United Medical Laboratories, Inc. (UML) created the employee profit sharing plan. UML funded this Plan with cash payments and by transferring some of its real property to the Plan. UML also sold certain land and buildings to the Plan which the Plan, in turn, leased back to UML. The Plan utilized a formula for periodically adjusting the rents on leased-back property according to a percentage of the Plan's aggregate costs in the property. The rents were also escalated proportionally with a Portland, Oregon cost of living index.
 
 
 3
 In 1972, ICN Medical Laboratories, Inc., a wholly-owned subsidiary of ICN Pharmaceuticals, Inc., purchased UML. It assumed UML's obligations under the leases and continued to conduct its operations as a medical facility on the property covered in the leases. However, it refused to pay the escalated rents to the Plan for the period 1968-1973.
 
 
 4
 In 1978, as a result of the Plan's threats to sue it for the escalated rents and also due to the passage of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. (ERISA), which prohibited an employer from engaging in sale and lease-back transactions with an employee profit sharing plan, ICN Medical Labs and the Plan mutually agreed to terminate the Plan.
 
 
 5
 ICN Medical Labs and the Plan entered into an Initial Agreement on August 30, 1978, which provided for (1) a lump sum settlement of the rents dispute, and (2) a means for the Plan to sell its property to ICN Medical Labs pursuant to ERISA requirements. The Plan's property had been appraised at $3.1 million. The Initial Agreement, however, provided for an adjustment of the purchase price according to a second appraisal.
 
 
 6
 In January of 1979, the parties entered a Revised Agreement. Part A of this Agreement provided for payment by ICN Medical Labs of $399,709.00 in settlement of the rent dispute. Part B provided for the sale of the Plan's property to ICN Medical Labs for $3,280,000.00, a figure obtained from an appraiser who had calculated the market value of the property under the assumption that it would continue to be operated as a medical facility.
 
 
 7
 Under Part B, ICN Medical Labs was required to pay $375,000.00 upon closing the property sale and the balance of $2.9 million in subsequent installments. To secure the balance, the Plan requested that ICN Medical Labs execute a Trust Deed for $2.9 million naming the Plan as beneficiary and deposit 841,423 shares of ICN stock in an Oregon bank as escrow. Regardless of the disposition of the stock, however, ICN Medical Labs guaranteed payments of the installments in cash. It also executed a promissory note to the Plan in the amount of the remaining $2.9 million.
 
 
 8
 ICN Medical Labs failed to pay the lump sum settlement of the rent dispute under Part A of the Revised Agreement. It did pay the $375,000.00 upon the closing of the property sale, but failed to deposit the stock as escrow or to meet the installment payments beginning in July, 1979. In December of 1979, ICN Medical Labs merged with its parent company ICN Pharmaceuticals, Inc. ICN Pharmaceuticals subsequently discontinued using the property in question as a medical facility and sold a major portion of this property to a third party.
 
 
 9
 The Plan brought two lawsuits against the LABS. The first suit sought specific performance of Part B of the Revised Agreement and the promissory note delivered to secure the purchase price of the property. The second suit sought monetary relief for the amount of the rents due on the original leases between the Plan and ICN Medical Labs from 1968-1973. Upon the stipulation of the parties, the two suits were consolidated for trial before a United States Magistrate. 28 U.S.C. § 636(c).
 
 
 10
 As to the first claim, the magistrate awarded the Plan judgment under Part B for the balance owed on the property sale, rejecting the LABS argument that the purchase price should be reformed because of the parties' mutual mistake regarding the method of appraisal. As to the second claim, the magistrate held that the Plan could bring suit on Part B of the Revised Agreement while foregoing suit on Part A in favor of suit on the underlying claim for rents due. He awarded the Plan $826,734.00 for past rents, plus interest. Judgment was entered accordingly. 28 U.S.C. § 636(c).
 
 
 11
 The LABS appeal both awards directly to this court. 28 U.S.C. § 636(c)(3). The Plan also appeals, asserting that the LABS' appeal is frivolous and/or vexatious.
 
 ISSUES
 
 12
 I. Did the magistrate err in refusing to reform the purchase price of the property under Part B of the Revised Agreement on the grounds of mutual mistake?
 
 
 13
 II. Did the magistrate err in permitting the Plan to seek specific performance on Part B of the Revised Agreement while foregoing suit on Part A?
 
 
 14
 III. Is the LABS' appeal frivolous and/or vexatious?
 
 DISCUSSION
 
 15
 Since this case involves a contract entered into and performed in Oregon, the law of Oregon must be applied. P & Z Pacific v. Panorama Apartments, 372 F.2d 759, 760 (CA9 1967).
 
 I.
 
 16
 The LABS argue that Part B of the Revised Agreement should be reformed because a mutual mistake was made regarding the appraised value of the Plan's property. They contend that the parties signed the Revised Agreement under the mistaken belief that the purchase price represented the fair market value of the property when, in fact, it represented the "in use" value, i.e., its value when used as a medical facility.
 
 
 17
 The parties seeking reformation of a written contract must establish, by the appropriate quantum of proof, (1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence. Jenson v. Miller, 280 Or. 225, 228-29, 570 P.2d 375, 377 (1977). Moreover, reformation is considered extraordinary relief and should not be granted unless the evidence and the equities in support of the claim are clear and unequivocal. Moyer v. Ramseyer, 226 Or. 122, 135, 359 P.2d 407, 412 (1961).
 
 
 18
 The magistrate found that the "weight of the evidence is against the existence of any mistake." Under Oregon law, this determination is subject to a de novo standard of review. Frick v. Hoag, 277 Or. 135, 138, 559 P.2d 879, 881 (1977).
 
 
 19
 We find that the conclusion of the magistrate is amply supported by the record and, therefore, the claim fails the second prong of the Jenson test. In addition, our review of the record convinces us that the evidence in support of the LABS' claim is anything but "clear and unequivocal." Accordingly, the decision to deny the LABS' request for reformation will not be disturbed.
 
 II.
 
 20
 The Revised Agreement is divided into two parts. Part A was designed to settle a rent dispute on amounts owed on land the LABS had leased from the Plan. Under this Part, the LABS were supposed to pay a liquidated sum. Paragraph 5 of Part A reads as follows:
 
 
 21
 "If the obligation set forth in paragraph 1, above, shall not be in default or shall be paid in full, the Plan shall never commence, maintain or further prosecute any action at law or suit in equity against ICN, Med Labs or any current officer or director or employee of ICN or Med Labs for any matter relative to the leases. However, this agreement is not intended as, and shall not be deemed to be, a release of any cause of action or cause of suit against any other person or entity."
 
 
 22
 Part B of the agreement dealt with the sale of certain properties by the Plan to the LABS. This provision was motivated by the fact that the sale/leaseback set-up that the Plan had been utilizing was no longer legal under ERISA.
 
 
 23
 The LABS defaulted on both Parts A & B. The Plan brought suit seeking specific performance of Part B (sale of properties), but foregoing suit on Part A (liquidated rent settlement) in favor of suit on the underlying claim for rent. The LABS argue that allowing this violates the general rule that a party may not normally affirm a contract in part and repudiate it in part. Mascall v. Erikson, 131 Or. 509, 515, 283 P. 2, 5 (1929).
 
 
 24
 The Revised Agreement contained the following "severability" clause:
 
 
 25
 "It is the intent of the parties hereto that this Agreement shall be implemented in its entirety. However, if for any reason including without limitation a prohibited transaction, one or more Paragraphs of this agreement or any provisions thereof cannot be implemented, the remaining portions of this Agreement shall be implemented. Severability of this Agreement shall include the portions of this Agreement relating to the Settlement and to the Purchase of the Property. If this Agreement cannot be implemented for any reason, the attempted settlement and/or sale shall be without prejudice to the rights or duties of either party." (Emphasis added)
 
 
 26
 The magistrate found that the LABS' default on the settlement payment prevented Part A from being "implemented", thus allowing it to be severed from Part B.
 
 
 27
 The magistrate also found that regardless of the "severability" clause, Paragraph 5 (quoted supra) never released the LABS from liability on the underlying claim for rent. It merely served to restrain the Plan from bringing suit while the LABS were not in default. Upon default, however, the Plan is no longer restrained and may bring suit on the underlying claim.
 
 
 28
 We agree with the magistrate's second approach. The overriding rule in the construction of contracts is that the intention of the parties prevails. Miller v. Miller, 276 Or. 639, 647, 555 P.2d 1246, 1250 (1976). Likewise, whether a contract is divisible is a question of the intention of the parties. Pettigrove v. Corvallis Lbr. Mfg. Co., 143 Or. 33, 35, 21 P.2d 198, 199 (1933); George v. School District No. 8R, 7 Or.App. 183, 188, 490 P.2d 1009, 1012 (1971). This intention is deduced from the language used and the surrounding circumstances. O.R.S. 42.220; Spooner v. Polk County, 19 Or.App. 557, 562, 528 P.2d 597, 599 (1974).
 
 
 29
 As to the language used, we feel that Paragraph 5 is controlling on the parties' intent. As the magistrate found, this clause authorizes suit on the underlying claim for rent upon the default of the LABS. Such a conclusion is clearly justified in light of the language employed.
 
 
 30
 As to the surrounding circumstances, it is clear that Parts A & B deal with distinct subject matter-Part A with a settlement of rents owed on leased property and Part B with the sale of property. There is no overlap of performance. Moreover, Parts A & B find their roots in separate motivations. Part A was designed to eliminate a rent dispute. In contrast, Part B was designed to make the Plan's operation conform to ERISA. Again, there is no overlap.
 
 
 31
 Accordingly, we hold that it was the manifest intention of the parties that the obligations created under Parts A & B (founded in separate motivations and dealing with distinct subject matter) were to be independent of each other. Thus, the Plan was justified in seeking specific performance of Part B while opting to forego suit on Part A in favor of suit on the underlying claim of rent.
 
 
 32
 This holding is ostensibly in conflict with the emphasized part of the aforementioned "severability" clause which reads: "It is the intent of the parties hereto that this Agreement shall be implemented in its entirety." It is a fundamental rule of construction that if an apparent inconsistency is between a clause that is general and broadly inclusive in character and a clause that is more limited and specific in its coverage, the latter should generally be held to operate as a modification of the former. Waterway Terminals Co. v. P. S. Lord Mechanical Contractors, 242 Or. 1, 23, 406 P.2d 556, 566 (1965). Specific Paragraph 5, authorizing suit on the underlying claim for rent upon the default of the LABS, controls over the general statement contained in the "severability" clause.
 
 
 33
 In view of what we have said, it is unnecessary to comment on the magistrate's first ground of affirmance.
 
 III.
 
 34
 We find that although it was not successful, the appeal of the LABS was not frivolous or vexatious.
 
 CONCLUSION
 
 35
 The judgment of the district court is AFFIRMED.
 
 
 36
 POOLE, Circuit Judge, concurring in part and dissenting in part:
 
 
 37
 I concur in part I of the majority opinion because the evidence in support of the Labs' claim of mutual mistake is not clear and unequivocal so as to justify reformation of the Agreement.
 
 
 38
 I dissent, however, from part II in the belief that the magistrate erred in concluding that the Plan could sue to enforce Part B of the Agreement while repudiating Part A and then invoking the underlying claim for rents. In my view, the Agreement is governed solely by the severability clause which clearly and unequivocally expresses the parties' intent that the Agreement is to be implemented in its entirety and is to be divisible only if one or more of its provisions "cannot be implemented." Paragraph 5 of Part A, upon which the majority relies, is not probative, let alone controlling, on the question of the parties' intent in this regard.
 
 
 39
 As noted by the majority, Part A was designed to settle the Plan's claim for rents owed by the Labs. Paragraph 5 of Part A is concerned with the time when the claim will be considered released. Specifically, it provides that the underlying claim is to be released only upon performance by the Labs of its obligations under Part A, thus preserving the Plan's right to sue on the claim in the event of default. It is utterly silent as to whether the Plan must repudiate the entire Agreement in order to sue on the underlying claim. Nothing in paragraph 5 sheds any light on the parties' intent concerning this question.
 
 
 40
 The magistrate's decision therefore stands or falls on the validity of his interpretation of the severability clause, a question the majority does not reach. In my view, the magistrate is in error in concluding that, because of the Labs' default, Part A was incapable of implementation and was thus severable from Part B. First, Part A could have been implemented by a suit for breach of contract. This is precisely what the Plan chose to do with respect to Part B as to which the Labs was also in default. Second, severance clauses of this type more likely are intended to preserve the remainder of a contract when one of its provisions is found to be unenforceable because it is illegal, impossible to perform, or against public policy. In other words, the provision is severable when it cannot be performed for some reason beyond the volition of the parties, rather than because one of the parties simply refuses to perform.
 
 
 41
 For these reasons, I would reverse and remand to the district court for further proceedings.