Submitted on briefs March 5, affirmed in part; reversed and remanded in part June 27, petition for rehearing denied August 2, petition for review denied November 27, 1973

PAPADOPOULOS, *Appellant-Cross-Respondent, v.* OREGON STATE BOARD OF HIGHER EDUCATION, *Respondent-Cross-Appellant.*

511 P2d 854

132

Michael Papadopoulos, Corvallis, pro se, for appellant-cross-respondent.

Lee Johnson, Attorney General, John W. Osburn, Solicitor General, and Al J. Laue, Assistant Attorney General, Salem, for respondent-cross-appellant.

Herbert W. Titus, Cooperating Attorney, Eugene, American Civil Liberties Union of Oregon, Inc., amicus curiae.

Hans A. Linde, Eugene, Interinstitutional Faculty Senate, Oregon State System of Higher Education, amicus curiae.

Donald W. Brodie, Cooperating Attorney, Eugene, and Stephen R. Goldstein, Philadelphia, Pennsylvania, for American Association of University Professors, amicus curiae.

Before SCHWAB, Chief Judge, and FOLEY and FORT, Judges.

SCHWAB, C. J.

Petitioner was employed as a Professor of Mathematics at Oregon State University from September 1967 to June 1970. In 1969 the respondent State Board of Higher Education or its subordinate officials at Oregon State decided to deny petitioner tenure and

to terminate his employment. By way of this judicial review proceeding pursuant to the Administrative Procedures Act, ORS ch 183, petitioner challenges those decisions. The circuit court upheld the Board and both petitioner and the Board appeal.

Literally dozens of issues have been briefed at length by petitioner and three amici supporting his position. The issues all relate to the substantive and procedural statutory and constitutional rights of public employes. For example, petitioner contends he was discharged because he engaged in First Amendment-protected activity or, alternatively, that his discharge was arbitrary; that he was entitled to a pretermination hearing on the reasons for his discharge; that the hearing he was accorded by the Board by order of the circuit court did not comply with the Administrative Procedures Act; and that the Board's discharge decision is not supported by substantial evidence. The Board, by its cross-appeal, contends the circuit court erred in ordering that petitioner be accorded a hearing on the reasons for his discharge. In our view the dispositive issue is whether petitioner was entitled to a hearing before being discharged effective June 1970.[1]

I

This record reveals, at the least, confusion on the part of the State Board of Higher Education and its subordinate officials at Oregon State University. To document this observation, we set out the facts in detail.

One source of confusion is the Board's regula-

---

[1] Schlichting v. Bergstrom, 97 Adv Sh 717, 13 Or App 562, 511 P2d 846 (1973) involves related issues.

tions. *See,* Parts II and IV, infra. These regulations provide that academic personnel, like petitioner, are employed with "yearly tenure" or "indefinite tenure." For the three years petitioner taught at Oregon State, he had only yearly tenure.

Petitioner assumed his duties as a Professor of Mathematics in the Department of Mathematics of the School of Science at Oregon State in the late summer of 1967. When he was offered this position by the Chairman of the Mathematics Department, before accepting it, petitioner inquired about the Oregon State tenure system. This was of some significance to petitioner, since another university had offered him a professorship with immediate tenure. The Chairman advised petitioner that under the Board's regulations it was not possible to be granted what those regulations term indefinite tenure when first hired. However, at the administrative hearing in this case several professors testified that they had been granted indefinite tenure at Oregon State when first hired.

In any event, correctly or incorrectly petitioner was informed it was not possible that he be granted indefinite tenure immediately. The Chairman did at least imply, and petitioner was led to believe, that the granting of indefinite tenure would be little more than a formality in his case.

Relying in part on these representations, and in part on the intent of the Mathematics Department to expand its programs in applied mathematics—petitioner's area of specialization—petitioner turned down other job prospects and accepted the offer from Oregon State. In fact, during the conversations that culminated in his employment at Oregon State, it was agreed that petitioner would devote a substantial

amount of time to building the Department's applied mathematics curriculum. All indications are that petitioner diligently and effectively did so.

In December of 1968, after petitioner had been at Oregon State about 1½ years, the Mathematics Department began processing a recommendation that petitioner be granted indefinite tenure. A four-member departmental committee unanimously recommended indefinite tenure for petitioner. The tenured faculty of the Department voted 20-1 in favor of indefinite tenure for petitioner. The Chairman of the Department added his own personal favorable recommendation.

The material generated in the Mathematics Department passed up the chain of command to John Ward, Dean of the School of Science. There had been previous instances in which Dean Ward displayed some displeasure toward petitioner. Between 1967-68, petitioner's first year at Oregon State, and 1968-69 most faculty members in the Mathematics Department received at least cost-of-living salary raises; through Dean Ward's efforts, petitioner did not receive any salary increase. Also, witnesses at the administrative hearing attributed to Dean Ward some highly defamatory statements about petitioner.[2]

Dean Ward consulted with his informal six-member Advisory Committee on all recommendations for indefinite tenure. When petitioner's case was discussed, some question was raised about petitioner's progress on a monograph he was writing. Dean Ward then asked the Chairman of the Mathematics

---

[2] Dean Ward, who has left Oregon, did not testify at the administrative hearing. Nor did he respond to interrogatories sent him by both petitioner and the Board.

Department for an answer to this question. The Chairman responded by letter:

"* * * Professor Papadopoulos is working on a research monograph on the topic of the theory of distributions as it pertains to the study of hyperbolic partial differential equations with particular applications to diffraction problems. I know enough of this topic to recognize that this would fill a significant gap in research literature. I have heard Professor Papadopoulos deliver a one-hour colloquium on some aspects of these questions; my impression from his sketch was that he had some very interesting contributions completed and also there remained much work to be done before he could achieve the degree of completeness demanded by a monograph. He estimates that he has about 1/3 of a completed first draft and, of course, notes and sketches of later parts."

Dean Ward did not tell his Advisory Committee of this letter; instead, purporting to be passing on an oral report, Dean Ward told the Committee there was no evidence that petitioner was making significant progress on his monograph. Also, Dean Ward told the Committee he had informally asked unidentified deans at other unspecified universities whether they would hire petitioner, and their answers were all in the negative. Not surprisingly, based on the information Dean Ward had furnished them, the Advisory Committee unanimously voted against recommending indefinite tenure for petitioner. The Committee was not asked to express any view on retention or non-retention of petitioner on an annual basis, and did not do so.

On February 25, 1969, Dean Ward then sent a letter to petitioner that stated:

"As you have been aware, the Department of Mathematics, and especially the faculty of the De-

partment, have undergone intensive evaluation and review by an outside evaluation committee and internal committees. After many hours of discussion and evaluation of the recommendations of all groups concerned, I have had to make several decisions concerning recommendations for indefinite tenure for non-tenured faculty members as well as informing faculty members not necessarily considered for tenure that they will not be reappointed to their positions * * *.

"* * * In your particular situation, you will not be recommended by this office to the Dean of Faculty for reappointment to the faculty of the Department of Mathematics after the academic year 1969-70."

In so far as it discloses a reason for his decision, Dean Ward's letter implies that petitioner's contributions to the Department of Mathematics were believed to be inadequate by various evaluation committees. The only evaluation reports to which Dean Ward could have been referring are in the record before us. There is nothing in those reports that is any way critical of petitioner.

After receiving Dean Ward's letter, petitioner protested to the Faculty Senate Committee on Review and Appeals that he was being dealt with unfairly. That Committee considered petitioner's case along with two others. The Committee reported:

"* * * * *

"In the opinion of the members of the Review and Appeals Committee, faulty judgment was evident on the part of the previous chairman of the Department of Mathematics when he implied, during appointment negotiations with the appellants, that the granting of indefinite tenure was a routine matter and would occur in the natural course of events even though based upon 'mutual satisfaction.' * * * [S]tatements made to prospective ap-

pointees probably should have spelled out more carefully the process by which indefinite tenure was granted and the ultimate responsibility for such decisions.

"Nevertheless, inquiries made by the Committee of the appellants and others disclosed that, while tenure matters were discussed (either orally or in writing), representations of the routine nature of indefinite tenure recommendations were such as to lead the appellants to believe that indefinite tenure would be granted as a matter of course. \* \* \* Such implied commitment on the part of the department chairman apparently was not unique but, rather, appeared to be the prevailing practice at the time of the appointment of, or negotiation with, the three appellants.

"By the same token, questionable procedures were followed by the Dean of Science in reversing the recommendations of the Department of Mathematics, especially in the instances of Drs. \* \* \* and Papadopoulos whose recommendations carried nearly unanimous approval, solely on professional grounds, by the tenured members of the Department.

"The 1966 Statement on Government of Colleges and Universities jointly formulated by the American Association of University Professors, the American Council on Education, and the Association of Governing Boards of Universities and Colleges, states in part V. The academic institution: the faculty—

" 'Faculty status and related matters are primarily a faculty responsibility; this area includes appointments, reappointments, not to reappoint, promotions, the granting of tenure, and dismissal. The primary responsibility of the faculty for such matters is based upon the fact that its judgment is central to general educational policy. Furthermore, scholars in a par-

ticular field or activity have the chief competence for judging the work of their colleagues; in such competence it is implicit that responsibility exists for both adverse and favorable judgments. Likewise there is the more general competence of experienced faculty personnel committees having a broader charge. Determinations in these matters should first be by faculty action through established procedures, reviewed by the chief academic officers with the concurrence of the board. The governing board and the president should, on questions of faculty status as in other matters where the faculty has primary responsibility, concur with the faculty judgment except in rare instances and for compelling reasons which should be stated in detail.'

"In light of the foregoing statement and assuming that the dean of a school falls within the class of a chief academic officer, statements received from members of the Mathematics Department indicate that reasons for failure by the Dean of Science to concur with the departmental recommendation were not clear other than that the department of mathematics at certain unidentified universities would not appoint these persons as full professors to their staffs.

"In addition to the failure of the Dean of Science to state in detail compelling reasons for failure to concur with the judgments of the departmental faculty, it is the opinion of the Committee that evaluations based upon whether or not a department at another university, (even if such were specified) would appoint an individual at a given rank is at best a questionable practice. Such practice becomes more suspect when one does not know the questions asked or the information presented in requesting such an evaluation. In addition, the question arises as to whether the same or similar standards necessarily apply for the determination

of eligibility for indefinite tenure as those which might be employed in evaluating an individual for initial appointment. Again, the validity of the procedure followed is at best controversial.

"It further appears (but not verified) that the procedure of requesting an evaluation by the chairman of department of another university in terms of qualification for appointment to that university's staff was followed only in the three cases in question and was not a routine step in the evaluative process carried out by the Dean of Science's office. While it may be agreed that the evaluation of the three cases in question might present special problems because of the academic rank involved, the unusualness of the procedure and the significance placed upon such conclusions drawn therefrom raises the question as to whether such represents a significant departure from accepted practice.

"While it can be taken as a responsibility of the dean of a school, within the context of the above statement of primary faculty responsibilities, to attempt to insure excellence of departmental faculties, it would also follow that in doing so due regard must be given to the judgments of departmental faculties. In view of the care and thoroughness which appear to have been exercised by the faculty of the Department of Mathematics in making their evaluations of staff members being recommended for tenure and that such recommendations represent the opinions of a substantial majority of the departmental tenured faculty, it would appear that failure by the Dean of Science to concur with such recommendations would necessarily have to be supported by compelling reasons stated in detail to the tenured departmental faculty. In the instances in question, such detailing of reasons for failure to concur was not apparent to those members of the Mathematics Department interviewed in the course of the Committee's investigations.

"The Review and Appeals Committee concludes and recommends to the President:

"That Indefinite Tenure be granted to Dr. Michael Papadopoulos on the basis of:

"1. The near unanimous and positive recommendation of the tenured members of the Mathematics Department, based solely on the professional competency of Dr. Papadopoulos and the failure on the part of the Dean of Science to state compelling reasons for lack of concurrence with the departmental recommendation.

"2. Prior commitment."

After receiving the above report and recommendations, the President of Oregon State, by letter dated September 24, 1969, advised petitioner he had reached a contrary decision. This letter stated in part:

"With some regret we must advise you that we do not support the recommendation of the Review and Appeals Committee that you be granted indefinite tenure as a Professor of Mathematics at Oregon State University. The principal reasons for our decision are summarized below:

"1. To the best of our knowledge and understanding, the action of the School of Science in not recommending the granting of tenure and in recommending your non-reappointment after the academic year 1969-70 does not involve prejudice or other violations of your academic freedom. A request to review the possibility of violations of academic freedom was implicit in our charge to the Committee. The Committee's report and supplementary letter support our belief that no violation of academic freedom occurred and that no personal prejudice or discrimination was involved on the part of any individual or group who participated in the decision.

"2. We believe that the action of the School of Science, by imposing additional standards and professional judgments in its review of your department's recommendation, was consistent with sound academic policy and involved significant and responsible faculty participation in the decision making process. In conducting its reviews, the School attempted to apply proper and uniform criteria to all recommendations in an effort to insure fairness and to develop and maintain high academic standards in all disciplines. Moreover, it is our belief that the Dean's final decision had the strong support of his faculty Advisory Committee * * * [9]

"3. Based on our review of both the departmental and school recommendations and also on our own attempt to evaluate your professional record, the executive office finds no sound academic basis for reversing the recommendation of the School of Science. Dean Ward has reported the reason for his decision to us, namely, the judgment that your professional record failed to demonstrate the degree of scholarly performance expected of a full professor in the School of Science. We consider this reason to be a proper basis for the dean's decision."

The President's letter concluded:

"* * * [W]e regard Dean Ward's letter of February 25, 1969, to you as a letter of timely notice of non-reappointment in accordance with the provisions of Section L-3-F of the Administrative

---

[9] The President's letter did not comment on the criticism of the Review and Appeals Committee to the effect that Dean Ward presented to his Advisory Committee inappropriate information on which to formulate its recommendation.

Code of the Oregon State Department of Higher Education."

Most prior attention had focused on whether petitioner would be granted indefinite tenure. Under the relevant regulations, *see,* Part II, infra, it would have been possible for petitioner to have been denied indefinite tenure, yet to remain at Oregon State on annual appointments for up to six years, perhaps being reconsidered for indefinite tenure at some future date. The record does not contain any clear explanation of why, in petitioner's case, the decision to deny indefinite tenure was coupled with a decision to also terminate his employment.

The President's reference to "the degree of scholarly performance expected of a full professor" was the first public reference to petitioner's termination being based on not having published a "sufficient" number of research papers. While it is clear this was a factor in the deliberations of Dean Ward's Advisory Committee, for some reason it had not been mentioned at all in the report of the Faculty Senate Review and Appeals Committee as being a stated reason for petitioner's termination.

Upon learning of the President's decision expressed in his letter of September 24, the Faculty Senate voted to conduct another, more detailed, investigation. The Faculty Senate created an Ad Hoc Committee consisting of three professors from outside of Oregon.

After spending two days at Oregon State in January of 1970, the Ad Hoc Committee reported:
"\* \* \* Both \* \* \* and Papadopoulos were, in the opinion of the two mathemetician members of

this committee, well above the average in the department and comparable with the most competent members. Hence they cannot be considered bad appointments * * *.

"That these appointments should have been offered and accepted without tenure requires separate discussion, for this was apparently connected with earlier university practice. Although opinion was not unanimous on this point, it seems to have been common before 1966 for tenure to be regarded as a certainty if one were more or less pulling his own weight in a department. * * * [B]oth * * * and Papadopoulos were apparently assured verbally that tenure was nothing to worry about even though the letter of appointment contained a caveat * * *.

"In 1966 with the advent of a new Dean of Science, Dean Ward, there was a sudden change in the attitude toward tenure and its granting, and this leads us into another aspect of the difficulty.

"When Dean Ward assumed his office in the fall of 1966, he apparently decided that one of his most important duties was to improve and upgrade the research quality of the various departments in the School of Science, and to increase also the quantity of research. This is, of course, a laudable goal and the time was possibly appropriate for taking some definite steps in this direction * * *.

"An important step [taken by Dean Ward] was the initiation of Departmental Review Committees consisting of distinguished men from outside the university who were charged with examining the department in question and making recommendations for its future development. One of the first such committees was appointed for the Mathematics Department. The three members (none of whom, by the way, were on a list of suggested persons given to the Dean by the Chairman) are outstanding mathematicians, spanning among them a large part of mathematics, and are also men of good will.

Unfortunately, their report was treated as a confidential report to the Dean and only portions of it shown to the Department members or to this committee. Those portions shown to us as a special privilege did not strike us as being unsuitable for general distribution. The parts not shown us contained among other things a rating of the department members on a scale of approximately 1 to 5—excellent, very good, good, fair, poor * * *.

"The Dean's treatment of this document as confidential has had an unfortunate effect. Perhaps unintentionally, it has been used as a weapon. Since no one *knows* where he stands, it is easy to imply that he is far down on the list and doesn't really deserve consideration in some matter or other. Whether such abuse is exaggerated or frequent is not the point. The situation should never arise and all future Visiting Committees should make their evaluations in terms which can be available to all. We think this can be done without precluding quality judgments.

"Another step taken by Dean Ward to improve quality was to apply more severe criteria for promotion and tenure. The somewhat easy-going attitude toward tenure which prevailed before 1966 was suddenly reversed and each tenure appointment was carefully scrutinized both by the dean and by his Advisory Committee. One can hardly find fault with taking such appointments seriously, but the suddenness of the change of policy certainly is a factor in the present case * * *.

"Against this background we now consider in more detail the appointments of * * * and Papadopoulos. As has already been pointed out, they, together with four other such appointees, came to OSU knowing that they did not in fact have tenure but believing that this was an administrative detail which would be taken care of in the near future, barring some gross neglect of duty or other malfeasance * * *.

"[When petitioner was considered for tenure] [a]s is customary in such matters, the chairman solicited letters from authorities outside the university who were likely to be familiar with the work of \* \* \* and Papadopoulos. The outside consultants were well chosen and with one exception wrote strong letters of support for promotion to tenure. The one exception was somewhat lukewarm, but was clearly not based upon knowledge of the man's published papers, but instead upon general impressions. The proposed promotions to tenure were supported unanimously in the case of one of the men and with only one dissenting vote for the other by the tenured members of the department.

"Why, then, were they refused by Dean Ward? Two reasons were offered: (a) lack of recent research activity ('lack of performance'), and (b) further consultation with mathemeticians outside the university \* \* \*.

"Before making this decision Dean Ward visited the chairmen of three other mathematics departments. He refused to identify them except to say that they did not include M.I.T. or Berkeley, a statement we interpret metaphorically to mean that the universities visited were appropriate ones for comparison with OSU. The question put to the department chairmen was, 'Would you hire either of these men in your department?' It is the opinion of the Ad Hoc Committee that this question, if indeed it was asked, is inappropriate and that, furthermore, there is considerable impropriety in the whole procedure. First of all, because it is secret and purely verbal, there is no written record to which one can turn for verifiable details as to the opinions of these department chairmen. Secondly, a department chairman is not competent to judge the quality of mathematical research except in his own field. It would be by the merest chance that his opinion, if he were willing to give one, would be as valuable as those of the authorities already consulted. One

of the chairmen consulted is accidentally known to us; his field of specialization is different from that of either of the men under consideration * * *.

"The other criterion was lack of research activity * * *.

"* * * [Petitioner's] publication record from 1954 to 1963 is outstanding. Following that period, there seems to be a gap until 1968 when two invited papers were given at a Symposium at Indiana University. One of these is appearing in the printed proceedings. We have seen the page proof and it appears to be a substantial paper. A criticism heard during our conversations at OSU that this was not a paper in a refereed journal seems misdirected and, furthermore a misreading of Papadopoulos's character. Whatever his faults, there is no evidence to indicate that he would be willing to publish pot-boilers. However, this still leaves a puzzling gap of five years.[4] This was partly explained in conversations with Papadopoulos. At the beginning of this period he developed a new method of treating a certain class of problems and decided that, instead of publishing it in a series of papers showing its application to different fields, he would write a monograph developing the method first and then the applications in succeeding chapters. There is no question but that he is writing the monograph. Various experts in the field referred to it in their supporting letters. One had a 105-page first draft of a portion of it, we saw it, and some of the material has been expounded in lectures at various places. Perhaps the real question is why has it taken so long to finish it. There seem to be several

---

[4] The Board, in arguing there is substantial evidence to support the decision to terminate petitioner's employment, relies heavily on this reference to a "puzzling gap of five years" in petitioner's record of publications. However, we note that at least three of these five years were before petitioner came to Oregon State, and that at the administrative hearing the Board stipulated that petitioner was well qualified when hired.

reasons, principally a sticky point in the development which has held him up, and, since coming to OSU, time spent in developing new courses. Although the period of not much visible activity may appear overlong for one who was so active in research earlier, it is not clear that he has either run out of steam or lost interest. If forced to judge whether his work will progress in a stable job environment or whether his drive to continue creative work has been largely lost for good, a difficult question of judgment, our committee would find itself split in its feelings, one saying the drive is inadequate for further productive work, and two saying it is adequate * * *."

The Ad Hoc Committee's report was submitted to the Faculty Senate. That body then adopted a resolution phrased in terms of the Ad Hoc Committee's ultimate conclusion:

"In our opinion the department [of Mathematics] will be in the best position for continued development of strength if the University accepts its moral commitment to award tenure in the cases of M. Papadopoulos and * * *.",

and requested the President of Oregon State to reconsider his prior decision to the contrary.

By letter dated February 19, 1970, the President advised petitioner:

"This office has given careful reconsideration to your tenure case in the light of the Faculty Senate's action of February 12, 1970, and of the ad hoc committee's report of February 3, 1970. We must advise you that our decision of September 24, 1969 has not been altered. This decision is based on our judgment, that the ad hoc committee's report concerning the adequacy of performance constitutes additional reasonable doubt that tenure should be granted."

The President's letter did not elaborate on why he believed a 2-to-1 vote that petitioner was likely to continue to produce good research and publications created "reasonable doubt that tenure should be granted."

Petitioner then appealed to the Board. In March of 1970 the Board's Academic Affairs Committee held a hearing on petitioner's appeal. The Committee limited its inquiry to questions of whether proper procedures had been followed at Oregon State in petitioner's case. In spite of the explicit statutory authority for the Board to make personnel decisions, ORS 351.070 (1)(a),⑤ the consensus among the Board members present was that the substantive questions of whether petitioner should be granted tenure or terminated were beyond their competence. As the Committee's report of that meeting states:

"* * * Mr. Layman expressed the view that as a matter of principle the board would be in a difficult position if it undertook to judge matters of substance relating to an individual's competence in an academic field and to substitute its judgment for that of the president—assuming their views differed.

"Chancellor Lieuallen pointed out the hazards of asking the board to rule on matters of substance in which the president had acted. If the board were to sustain a faculty member's appeal and reverse the president's decision, what would keep the board tomorrow from making the decision to insist upon the employment or the granting of tenure to some-

⑤ "(1) The State Board of Higher Education may, for each institution under its control:

"(a) Appoint and employ a president and the requisite number of professors, teachers and employes, and prescribe their compensation and tenure of office or employment." ORS 351.070 (1)(a).

one acceptable to the board but who might be unacceptable to the president or to faculty groups."

The Committee concluded that proper procedures were followed in petitioner's case. It so reported to the Board, which then adopted these conclusions.

Petitioner then initiated this judicial review proceeding in circuit court. The Board initially contended it was wholly exempt from the Administrative Procedures Act. The circuit court ruled to the contrary— a ruling the Board's cross-appeal does not assign as error. Petitioner then called the circuit court's attention to: (1) some omissions and possible errors in the transcript of the hearing before the Board's Academic Affairs Committee; and (2) the fact that the Committee had limited its inquiry to purely procedural matters. Petitioner contended these were grounds for remanding the case to the Board for the production of additional evidence. The circuit court agreed and entered the following order on February 11, 1971:

"Application having been made by petitioner for leave to present additional evidence, and it having been shown to the satisfaction of the Court that respondent agency is subject to the Oregon Administrative Procedures Act, that the additional evidence is material and that there were good and substantial reasons for failure to present it in the proceeding before the agency, it is hereby ordered that additional evidence be taken by respondent agency under the conditions imposed in ORS 183.-420, 183.440, 183.450 and 183.480 (5)."

By this order the circuit court, in effect, ruled that the Board had to accord petitioner a hearing on the grounds for the termination of his employment.

In compliance with the circuit court's order, petitioner was granted a four-day hearing. The hear-

ing officer prepared detailed proposed findings of fact and conclusions of law, all generally adverse to petitioner's position. After considering the administrative record, the Board adopted its own more limited findings

"1) That the procedure followed by the Oregon State University administration concerning the non-renewal of the appointment of Dr. Papadopoulos and concerning the denial of tenure to him complied with procedural due process in all respects.

"2) That there was substantial evidence to justify the finding by the administration at Oregon State University that Dr. Papadopoulos did not comply with the standards of Oregon State University School of Science for production of scholarly research.

"3) That the administration at Oregon State University did not base its decision to deny Dr. Papadopoulos indefinite tenure and a renewal of his academic appointment on any conduct protected by the constitution and laws of the United States of America and the State of Oregon.",

and conclusion

"That the decisions of Oregon State University not to grant indefinite tenure to Dr. Papadopoulos and not to renew his academic appointment are affirmed."

## II

Whether petitioner was entitled to a pretermination hearing on the reasons for his discharge depends upon a combination of Oregon statutes and United States Supreme Court cases interpreting the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We first consider

some of the relevant statutes. In Part III, infra, we consider the constitutional authorities.

■ One relevant statute is the Administrative Procedures Act, ORS ch 183. However, there is a question as to which of two different versions of the Administrative Procedures Act is applicable to this case. Some "old" parts of the Administrative Procedures Act were repealed effective September 9, 1971 and, at the same time, some "new" parts of the Administrative Procedures Act went into effect. This case was pending in circuit court on September 9, 1971. Does the "old" or the "new" version of the Administrative Procedures Act apply?

In *Russell et al v. Pac. Maritime et al*, 9 Or App 402, 406, 496 P2d 252, Sup Ct *review denied* (1972), we held that:

"* * * [T]he pre-September 9, 1971 procedures, including circuit court jurisdiction, apply to all cases of this type that were validly pending in circuit court on that date."

While the specific question in *Russell* was. one of jurisdiction, we believe that holding to be applicable here.

The chronology in this case was as follows. The original petition for judicial review was filed May 7, 1970. After a demurrer was granted an amended petition was filed. After a motion to strike was granted in part, a second amended petition was filed on August 7, 1970. Following additional proceedings, this case was remanded to the Board on February 11, 1971. In compliance with the circuit court's remand order, a contested case hearing was held June 16, 17, 18 and 29, 1971. Based on the hearing record, the

Board made its final decision on September 7, 1971. By letter dated September 14, 1971, the administrative record was transmitted to the circuit court and filed therein September 16, 1971. The circuit court proceeded to decide the merits, upholding the Board's September 7, 1971 decision.

Thus it is apparent that all critical events in this case occurred before the September 9, 1971 effective date of the "new" Administrative Procedures Act. The original petition for judicial review was filed 16 months before that date. The order that the Board accord petitioner a contested case hearing was made seven months before that date. The hearing was concluded two months before that date. And the Board's final decision was made two days before that date. During all of this time the "old" Administrative Procedures Act was in effect. It is the law by which those events should be judged.

The only events that occurred after September 9, 1971, were: (1) the filing of the Board's final decision with the circuit court; and (2) the circuit court's decision on the merits. The latter does not make the "new" Administrative Procedures Act applicable. A circuit court's decision is always going to be rendered after September 9, 1971, in cases like *Russell et al v. Pac. Maritime et al,* supra.

The various briefs all simply assert that because the Board's final decision was filed in the circuit court after September 9, 1971, therefore the "new" Administrative Procedures Act is applicable. We disagree. Review of the Board's final decision was not in any way a new proceeding arising after September 9, 1971. It was the culmination of a single case that had been pending for 16 months on that date. The circuit

court had not lost jurisdiction when it remanded this case to the Board. This was the same lawsuit both before and after the remand. There is no basis for the assertion that the "new" Administrative Procedures Act applies.[6]

The "old" Administrative Procedures Act used the term "contested case" to describe those situations in which an agency was required to grant a hearing before making a decision. The "old" Administrative Procedures Act described the basic procedures that had to be followed at a contested case hearing, such as reasonable notice, right to counsel, right to present evidence and right to cross-examine adverse witnesses. *See,* ORS 183.420 to 183.460 (1969). Contested case was defined as:

> "* * * [A] proceeding before an agency in which the individual legal rights, duties or privileges of specific parties are required by statute or constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard * * *." ORS 183.310 (2) (1969).

Thus, in general, the "old" Administrative Procedures Act did not *per se* identify those situations in which a contested case hearing was required, but, instead, required examination of other statutes and constitutional authorities to determine when a contested case hearing was mandatory before an agency made a final decision.

There are, of course, numerous statutes governing various aspects of public employment. One of the

---

[6] In view of our conclusion that the "old" Administrative Procedures Act governs, we express no view on the question of whether the terms of the "new" Administrative Procedures Act would produce a different result in this case—a question briefed at length by the parties.

universal characteristics of these various statutory schemes is the distinction between probationary and tenured public employes. Specifically, any individual public employe is generally in one of three groups: (1) those with permanent job security, i.e., tenured; (2) those with no job security, i.e., probationary; and (3) those with some, but not permanent job security. In general, the distinction is that, by statute, tenured public employes can only be discharged "for cause" established in a hearing, while probationary public employes can be discharged for any reason or no reason and have no right to a hearing on the grounds therefor.

 Many examples are available to illustrate the contrasts between these different groups. State employes are either "classified," "unclassified," or "exempt."⑦ ORS 240.195 to 240.210. All unclassified and exempt employes are in the second group, i.e., there are no statutory limits on the prerogative of the state to discharge such employes. At the beginning of their employment, classified employes "serve a trial period of not to exceed six months." ORS 240.405 (1). During this initial probationary period classified employes enjoy no significant statutory job security. *See,* ORS 240.410. After completing this probationary period, the employe becomes a "regular employe" within the meaning of ORS 240.560 (1), and thereafter can only be discharged "for cause," ORS 240.560 (4), defined as "misconduct, inefficiency, incompetence, insubordination, indolence, malfeasance or other unfitness to render effective service," ORS 240.555 (1). Also, a regular classified employe must be granted a

---

⑦ The differences between "unclassified" and "exempt" state employes are not of any importance for present purposes—both groups are similarly situated in so far as their job security.

hearing on whether the statutory grounds exist for his discharge. *See,* ORS 240.560; *Phillips v. State Bd. of Higher Ed.,* 7 Or App 588, 490 P2d 1005 (1971), Sup Ct *review denied* (1972). In other words, a regular classified employe of the state enjoys permanent job security; by statute he can only be discharged for certain enumerated grounds and in accordance with certain established procedures.

■ A similar pattern exists for public employes in local governmental units. ORS ch 241 creates civil service requirements with which counties having a population of 300,000 or more must comply. ORS 241.020. When first hired by such a county, an employe "shall be on probation for a period * * * not to exceed one year if the position is in the police department of the office of the sheriff, otherwise not to exceed six months." ORS 241.265. After completing the required probationary period, the employe's "appointment shall be deemed permanent." ORS 241.275. Thereafter, a permanent employe can only be dismissed "for cause," ORS 241.425, 241.430, pursuant to statutory hearing procedures, ORS 241.435 to 241.445. Counties with a smaller population than 300,000 may but are not required to adopt such civil service rules and procedures. ORS 241.006. Thus, permanent employes in larger counties are part of that group of public employes which enjoys permanent job security. Probationary employes in larger counties and all employes in smaller counties which have not chosen to adopt a civil service system are part of that group of public employes which enjoys no job security. *See,* ORS 204.601 (2); *Schlichting v. Bergstrom,* 13 Or App 562, 511 P2d 846 (1973).

■ In school districts having a population of 100,-

000 or more, custodians, after serving a six-month probationary period, ORS 242.580, achieve permanent job security, ORS 242.590. Firemen, after serving a 12-month probationary period, ORS 242.766 (1), achieve permanent job security, ORS 242.768 (1), and thereafter can only be discharged "for cause," ORS 242.796, 242.798; *see, Myers/Sherwood v. Tualatin RFD,* 5 Or App 142, 483 P2d 95 (1971).

■ This general pattern obtains in the case of public elementary and secondary school teachers, albeit with a bit more detail and complexity. ORS ch 342. There is no provision for teacher job security in the smallest school districts, those having an average daily pupil attendance of less than 800. Teachers in intermediate-sized districts with average daily attendance of more than 800, but less than 4,500, have those rights and duties enumerated in ORS 342.508 to 342.553. They are initially hired on a series of three one-year contracts. *See,* ORS 342.508; *George v. School Dist. No. 8R,* 7 Or App 183, 490 P2d 1009 (1971). Thereafter, if rehired, they must be given three-year contracts. ORS 342.508. During the term of one-year or three-year contracts, a teacher can only be discharged for the reasons specified in ORS 342.530. But at the end of any contract period "the school board could decline to renew the contract for any reason." *George v. School Dist. No. 8R,* supra, 7 Or App at 195. Thus, teachers in such an intermediate-sized school district are an example of the group of public employes who have some, but not permanent job security.

■ Teachers in the largest school districts, those with average daily attendance of more than 4,500, are treated similarly to state employes. ORS 342.805 to 342.955. In such a school district a teacher serves a

probationary period of three years, ORS 342.815 (5), presumably with a series of one-year contracts, *see,* ORS 342.505, *cf.,* ORS 342.835 (1). It is not completely clear what the extent of a teacher's job security is during the term of his contracts while in this probationary period. *Compare,* ORS 342.835 (1) *with* ORS 342.530. It is clear that at the end of the term of the contracts during the probationary period a teacher has no job security.

> "The district board may, for any cause it may deem in good faith sufficient, refuse to renew the contract of any probationary teacher." ORS 342.-835 (2).

If rehired after three years, a teacher achieves permanent job security. ORS 342.845. Thereafter, he can only be discharged for the grounds stated in ORS 342.865 and in accordance with the procedures stated in ORS 342.895 to 342.960.

As this survey of some of the statutory provisions governing public employment makes apparent, a feature common to all of the statutory schemes is that a new public employe serves an initial probationary period followed, in most cases, by the possibility of acquiring permanent job security. The probationary period, obviously, is designed to permit on-the-job observation and evaluation of the new employe's performance so that only those of demonstrated competence will acquire permanent job security. *See, Cammarata v. Essex County Park Comm'n,* 26 NJ 404, 412, 140 A2d 397 (1958):

> "It is difficult to evaluate the character, industry, personality, and responsibility of an applicant from his performance on a written examination or through cursory personal interviews. Knowledge

and intelligence do not alone [suffice] * * *. The crucial test of his fitness is how he fares on the job from day to day when suddenly confronted by situations demanding a breadth of resources and diplomacy. Many intangible qualities must be taken into account, and, since the lack of them may not constitute good cause for dismissal under a tenure statute, the [employer] * * * is entitled to a period of preliminary scrutiny, during which the protection of tenure does not apply, in order that it may make pragmatically informed and unrestricted decisions as to an applicant's suitability."

Because of this valuable role that probationary public employment can serve, statutory schemes that distinguish between tenured and probationary employes have been uniformly upheld against challenges based on the Equal Protection Clause of the Fourteenth Amendment. *Schlichting v. Bergstrom,* supra, and cases cited therein.

There are no detailed statutes governing the employment of academic personnel by the State Board of Higher Education. Instead, the legislature has granted the Board general authority in this matter:

"The State Board of Higher Education may, for each institution under its control:

"(a) Appoint and employ a president and the requisite number of professors, teachers and employes, and prescribe their compensation and tenure of office or employment.

"* * * * *

"(2) The State Board of Higher Education may, for each institution, division and department under its control:

"* * * * *

"(b) Enact rules and bylaws for the government thereof, including the faculty, teachers, stu-

, dents and employes therein." ORS 351.070 (1)(a), (2)(b).[®]

Pursuant to this authority, the Board has adopted regulations covering employment matters. They conform to the general scheme discussed above.

■ The Board's academic employes have either "yearly tenure" or "indefinite tenure." Although there are no definitions of these terms in the regulations, it is apparent that indefinite tenure means an academic employe cannot be discharged except for cause. Also it is apparent that yearly tenure means that an employe can only be discharged for cause during the term of his one-year appointment, but can be discharged, i.e., not rehired, for any reason at the end of each year.

The regulations seem to contemplate that an academic employe will usually initially be hired with yearly tenure. Then at some point within the next six years a decision will be made as to whether he will be granted indefinite tenure.

■ This sketch of the Board's employment practices is distilled from the following regulations that were in effect at the times material to this case.[®]

---

[®] State ex rel Kleinsorge et al v. Reid, 221 Or 558, 352 P2d 466 (1960), discusses the statutes governing the operations of the Board at length.

[®] All citations to the Board's regulations are to the provisions in effect at the time material to this case, all of which have since been replaced by new regulations. We cite the older regulations material to this case as "1969 Adm. Code."

We have previously treated the Board's 1969 Adm. Code as having the force of law. West v. Bowers, 11 Or App 364, 502 P2d 270 (1972), Sup Ct *review denied* (1973); Vandever v. State Bd. of Higher Ed., 8 Or App 50, 491 P2d 1198 (1971), Sup Ct *review denied* (1972). We continue to do so in this case.

"* * * All * * * [academic] employees * * * shall receive each year formal notification of conditions and terms of employment for the fiscal year beginning July 1. Such notification is sent out from the president's office. Unless otherwise specifically stipulated in individual notices, or otherwise provided herein, appointments or reappointments are for a period not beyond the fiscal year designated in the notice of appointment. The official form is approved by the chancellor's office * * *." 1969 Adm. Code, sec L-3-A (4).

"Full-time members of the academic staff appointed with the rank of assistant professor or above shall be employed on a one-year basis, and ordinarily are considered for indefinite tenure effective with the fourth year of service. It is recognized that at times it may be desirable to grant indefinite tenure, before the end of three years to persons appointed with the rank of associate or full professor. An annual review shall be made by the president of those persons eligible for promotion beyond the rank of assistant professor.

"If any appointment of an academic staff member * * * not on indefinite tenure, is to be terminated otherwise than for cause, he shall be given a timely notice of termination as follows: during the first annual appointment, at least three months' notice; thereafter, at least twelve-months' notice * * *. Annual appointment for a seventh consecutive year shall normally include the granting of indefinite tenure unless the seventh annual notice of appointment specifically provides otherwise.

"The provisions of this section shall apply to all appointments unless in individual cases there is a definite written understanding to the contrary, in which case the exception will be noted in the notice of appointment." 1969 Adm. Code, sec L-3-F.

"* * * The appointment of an academic staff member with indefinite tenure will not be termi-

nated for reasons other than for cause, except for financial exigency * * *." 1969 Adm. Code, sec L-3-FF (2)(b).

"* * * [Termination of employment—not for cause—staff members without indefinite tenure]. Appropriate notice of termination shall be provided staff members without indefinite tenure as set forth in Section L-3-F of the Administrative Code * * *." 1969 Adm. Code, sec L-3-FF (2)(c).

"* * * The appointment of an academic staff member, whether or not having tenure, may be terminated for cause as herein provided. 'Cause' shall be understood to include gross inefficiency, conviction of a felony, or conduct flagrantly unbecoming a faculty member." 1969 Adm. Code, sec L-3-FF (3)(a).

The regulations do not specifically define any standards governing an initial appointment to a faculty, or governing decisions whether to reappoint or not to reappoint a faculty member with yearly tenure, or governing whether to grant or deny indefinite tenure. *But cf.,* 1969 Adm. Code sec C-2:

"While not unmindful of other objects of state-supported institutions of higher learning, namely research and extension, or other service to the state, imparting instruction on the respective campuses is the primary and fundamental function of the institutions."

### III

■ The above-discussed statutes are important in determining whether a public employe has a constitutional right, under the Due Process Clause, to a pre-discharge hearing. Specifically, tenured public employes do have a right to a hearing, but probationary public employes do not. *Board of Regents v. Roth,* 408 US 564, 92 S Ct 2701, 33 L Ed 2d 548 (1972); *Perry*

*v. Sindermann,* 408 US 593, 92 S Ct 2694, 33 L Ed 2d 570 (1972) ; *see also, Slochower v. Board of Education,* 350 US 551, 76 S Ct 637, 100 L Ed 692 (1956).

The *Roth* case involved a nontenured assistant professor in his first year of his first job teaching in the Wisconsin public higher education system. In accordance with the relevant Wisconsin statutes and regulations he was given timely notification that his contract would not be renewed for a second year. He then initiated an action in federal court contending he was entitled to a statement of reasons for his nonretention and a pretermination hearing to contest those reasons.

The Supreme Court held to the contrary. "The requirements of procedural due process apply only to the deprivation of interests encompassed within the Fourteenth Amendment's protection of liberty and property. * * *" 408 US at 569. The Supreme Court concluded that a public employer's decision not to retain a probationary employe did not ordinarily constitute a deprivation of liberty. "* * * It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another. * * *" 408 US at 575. Also, the Supreme Court concluded that a public employer's decision not to retain a probationary employe did not ordinarily constitute a deprivation of property.

> "* * * To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people

rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

"Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. * * *

"* * * * *

"* * * [T]he terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment. Nor, significantly, was there any state statute or University rule or policy that secured his interest in re-employment or that created any legitimate claim to it. In these circumstances, the respondent surely had an abstract concern in being rehired, but he did not have a *property* interest sufficient to require the University authorities to give him a hearing when they declined to renew his contract of employment." 408 US at 577-78.

The *Sindermann* case also involved a college professor. He had been employed on a series of one-year contracts in the Texas public higher education system for 10 years. During his tenth year of teaching he was given timely notice that his contract would not again be renewed. Like Professor Roth, Professor Sindermann then went to federal court urging he was entitled to a statement of reasons for his nonretention and a pretermination hearing to contest those reasons.

His complaint alleged that while the public junior college where he had been employed had no

formal tenure system, it "had a de facto tenure program." 408 US at 600. He alleged this program was based on a provision "in the college's official Faculty Guide" and on "* * * *guidelines promulgated by the Coordinating Board of the Texas College and University System that provided that a person, like himself, who had been employed as a teacher in the state college and university system for seven years or more has some form of job tenure. * * *"* (Emphasis supplied.) 408 US at 600.

The Supreme Court held that if Professor Sindermann could prove these allegations he would thereby establish that he "* * * had no less a 'property' interest in continued employment than a formally tenured teacher * * *," 408 US at 601, and "* * * such proof would obligate college officials to grant a hearing at his request, where he could be informed of the grounds for his nonretention and challenge their sufficiency." 408 US at 603.

█ As previously noted, numerous statutes and regulations entitle certain public employes to permanent job security, i.e., they can only be discharged for enumerated causes. For employes who have achieved tenured status, these statutes create property interests within the meaning of the Fourteenth Amendment. Such employes cannot be deprived of this property interest without first having a hearing that satisfies due process requirements. *Perry v. Sindermann,* supra.

█ Also as previously noted public employes when first hired commonly are required to serve a probationary period. This can vary in length from up to six months for state classified employes to up to six years for professors employed by the State Board of Higher Education. Other public employes are in posi-

tions for which no provision has been made for ever acquiring permanent job security. *See, Schlichting v. Bergstrom,* 13 Or App 562, 511 P2d 846 (1973). Employes who are in probationary status, either temporary or permanently, have no property interest within the meaning of the Fourteenth Amendment. The constitution does not require that they be granted a pretermination hearing or be informed of the reasons for their discharge.[⑳] *Board of Regents v. Roth,* supra.

 Thus in Oregon, public employe tenure rights arise solely from statutes or, in the case of the Board, regulations adopted pursuant to a statutory delegation of authority. *See,* Part II, supra. It is these tenure rights based on statute or regulation that create property interests that cannot be withdrawn without a due process hearing. Employment contracts of public employes may create rights to continued employment over and above that provided by statute or regulation. But such an employment contract, standing alone, does not create the kind of interest that triggers the requirement of a due process hearing before the government withdraws the benefits of the contract, i.e.,

---

[⑳] By statute the legislature could extend any additional procedural rights it wished to probationary employes. Much of the argument before us relates to whether the legislature intended to do just that by way of the 1971 amendments to the Administrative Procedures Act, a question we do not reach. *See,* n 6, supra. Or the Board could, by regulation, expand the procedural rights of its probationary employes; Toney v. Reagan, 467 F2d 953 (9th Cir 1972), *cert denied sub nom* Mabey et al. v. Reagan et al., 409 US 1130 (1973), discusses the details of regulations whereby nontenured faculty members were granted a right to a hearing if their appointments were not renewed. Due process always speaks in terms of the minimum necessary procedures, whereas the legislature or the Board may well be concerned with the best possible procedures.

Also, several recent cases have involved hearing rights based on collective bargaining agreements. E.g., Curbelo v. Macomb College Trustees, 38 Mich App 432, 196 NW2d 843 (1972).

breaches it. In such a situation, the public employe's remedies are measured by the law of contracts, not by constitutional law.

## IV

With these principles in mind, we turn to the question of whether petitioner was entitled to a contested case hearing before the Board terminated his employment effective June of 1970. This depends upon whether the Board was "required by statute or constitution" to hold a hearing before deciding to terminate petitioner's employment. ORS 183.310 (2) (1969).

■ The Board was not required by statute to hold such a hearing. As discussed in Part II, supra, under the state civil service laws unclassified employes have no statutory right to a hearing on the grounds for their dismissal. Unclassified employes include all academic employes of the Board. ORS 240.207 (1)(b)(E).

Whether the Board was required by constitution to accord petitioner a pretermination hearing depends upon the existence and extent of petitioner's entitlement to future employment under the Board's regulations. See, Part III, supra. When initially hired for the 1967-68 academic year, petitioner had a one-year appointment, i.e., what the Board's regulations term "yearly tenure." When reappointed for the 1968-69 and 1969-70 academic years petitioner also had yearly tenure. By the provisions of the relevant regulations, see, Part II, supra, these appointments created property interests in the sense that petitioner could not have been discharged during any of those academic years without the Board's first holding a hearing on the reasons for his discharge. But also under the Board's regulations petitioner could have been dis-

charged at the end of any of those years for any reason or no reason, and he would have no right to a hearing on the grounds for his discharge.[10]

■ But that is not the end of our inquiry. One of the Board's regulations in effect at the times material to this case provided:

> "If any appointment of an academic staff member * * * not on indefinite tenure, is to be terminated otherwise than for cause, he shall be given a timely notice of termination as follows: * * * at least twelve-months' notice * * *." 1969 Adm. Code, sec L-3-F

The effect of this regulation is to entitle the Board's academic employes to continued employment unless and until they receive timely notice of termination in accordance with the requirements of the regulation. *See, Zimmerman v. Minot State College,* 198 NW2d 108 (ND 1972); *Pima College v. Sinclair,* 17 Ariz App 213, 496 P2d 639 (1972).

---

[10] It may seem anomalous that a professor on yearly tenure has no right to a hearing if dismissed at the end of his sixth year of teaching at Oregon State, while many courts have held that a college student cannot be expelled at any point without a hearing. *See,* Dixon v. Alabama State Board of Education, 294 F2d 150 (5th Cir), *cert denied* 368 US 930 (1961); *see generally,* Wright, *The Constitution and the Campus,* 22 Vand L Rev 1027 (1969); Annotation, 58 ALR2d 903, 905 (1958). It may seem anomalous that a professor employed by the Board, unless and until granted indefinite tenure, enjoys less job security than the maintenance employe in the University of Oregon power plant involved in Beistel v. Pub. Emp. Relations Bd., 6 Or App 115, 486 P2d 1305 (1971). It may seem anomalous that under the Board's regulations a university professor can have less job security than do virtually all teachers in this state's public primary and secondary schools under ORS ch 342.

To the extent that these anomalies, if that they be, are the product of statutes and regulations, the legislature or the Board, respectively, are the appropriate forums in which to question the wisdom of such results.

The Board's regulations are thus different from the comparable Wisconsin regulations involved in the *Roth* case. In Wisconsin public universities:

" '* * * The employment of any staff member for an academic year shall not be for a term beyond June 30th of the fiscal year in which the appointment is made.' * * *" 408 US at 566, n 1.

" '* * * February first is established throughout the State University system as the deadline for written notification of non-tenured faculty concerning *retention or non-retention* for the ensuing year. The President of each University shall give such notice each year on or before this date.' " 408 US at 567-68, n 4. (Emphasis supplied.)

Under these rules requiring formal notification of "retention or non-retention" it would appear that silence would be tantamount to nonretention. By contrast, under the Oregon State Board's rules, silence, i.e., failure to give twelve months' notification of nonretention, is tantamount to retention.

■ The Board's regulations are unclear as to whether the twelve months' notification requirement means twelve months before the beginning of the fiscal year, referred to in 1969 Adm. Code, sec L-3-A (4) as being July 1, or twelve months before the beginning of the academic year, referred to in 1969 Adm. Code, sec L-3-B as being September 16, or twelve months before the effective date of the termination, i.e., the end of the academic year, referred to in 1969 Adm. Code, sec L-3-B as being June 15. The last possibility seems most plausible, that is, in order to terminate petitioner's employment effective June 1970, it would have been necessary to so notify him by June 1969. However, we need not resolve this ambiguity in the Board's regulations because under any possible con-

struction of the required notification date petitioner did not receive timely notification of termination.

The Board argues that Dean Ward's letter of February 25, 1969, to petitioner complied with the notice requirements of 1969 Adm. Code, sec L-3-F, i.e., that petitioner received 16 months' notice his employment would be terminated effective June 1970. Petitioner contends the first formal notification of termination he received was the Oregon State President's letter of September 24, 1969, and that this notification was too late under 1969 Adm. Code, sec L-3-F to terminate his employment effective June 1970. We agree with petitioner.

■ As in *Wallis v. Crook County School Dist.*, 13 Or App 174, 509 P2d 44 (1973), the relevant inquiry is not whether petitioner had knowledge of the possibility that he would be discharged; rather, the relevant inquiry is whether petitioner received timely notice of termination in compliance with 1969 Adm. Code, sec L-3-F. It seems obvious that the notice of termination contemplated by 1969 Adm. Code, sec L-3-F is notice from somebody with authority to make the decision to terminate. We conclude that there is no authority to terminate a professor's employment below the University President level.

As previously noted, Part II, supra, the Board has explicit statutory authority to "employ * * * professors * * * and prescribe their * * * tenure of * * * employment." ORS 351.070 (1) (a). Presumably, there would be no problem with the Board's delegating some or all of its authority over personnel decisions to subordinates. *Cf., Beistel v. Pub. Emp. Relations Bd.*, 6 Or App 115, 486 P2d 1305 (1971). However, the Board's regulations are obscure as to whether there has, in fact, been such a delegation.

Following the tenor of ORS 351.070 (1)(a), one part of the regulations seems to provide that the Board has all control over personnel decisions:

"* * * Appointments to positions in the academic classification in the salary budget are made by the board upon the recommendation of the department head, the dean, the executive head of the institution, and the chancellor." 1969 Adm Code, sec L-3-A (1).

However, 1969 Adm. Code, sec F-2-A provided:

"The chancellor shall have complete authority * * * over the selections, appointment, promotion, salaries, transfers, suspensions, and dismissals of all officers, members of the faculties, and other employees of the system and its component divisions, exercising this authority by making recommendations to the board, in which rests the sole power of decision. * * *"

This section appears to be internally inconsistent; it starts with the statement that the chancellor has "complete authority," but concludes by stating the Board has "the sole power of decision." Moreover, 1969 Adm. Code, sec G-1-B further muddies the waters by seeming to give each university president a measure of control over personnel decisions:

"The president [of each university] shall * * * have the initiative in the selection of all officers, members of the faculties, and other employees of his institution, subject to the approval of the chancellor. He shall exercise this authority in case of subordinate positions by filling vacancies as they may occur upon approval of the chancellor * * * when the salary outlay is within the budget appropriations provided by the board for such positions, and in case of major positions by making recommendations of appointment through the chancellor to the board, in which rests the sole

power of election and confirmation of appointment."

Several of the above-quoted regulations deal primarily or exclusively with initial hiring decisions. The Board's regulations depart from their usual crypticness and deal with the subject of termination procedures at some length. Most of the detail relates to terminations for cause. After a hearing before an ad hoc seven-member faculty committee, the "institutional executive" (presumably meaning the president) makes a decision. 1969 Adm. Code, sec L-3-FF-3 (i). If that decision is adverse to the teacher, he can appeal to the Board and

> "The State Board of Higher Education may conduct such hearings as it deems proper for its consideration of an appeal, or it may refer the appeal to a committee of Board members for consideration and recommendation. * * *" 1969 Adm. Code, sec L-3-FF-3 (j).

The regulations contain no parallel provisions applicable to terminations not for cause. Thus, there is no answer in the regulations to the question of who makes a decision to terminate, i.e., not to renew the contract of a professor on yearly tenure.

The record is more illuminating. The proceedings at the Mathematics Department level—the Committee vote that petitioner be granted indefinite tenure, the vote of the tenured faculty that petitioner be granted indefinite tenure, and the Chairman's personal endorsement—were all phrased as recommendations and passed up the chain of command as such, for a final decision to be made at a higher level. After "consulting" with his Advisory Committee, Dean Ward's letter of February 25 stated:

> "* * * [Y]ou will not be *recommended* by this

office to the Dean of Faculty for reappointment to the faculty of the Department of Mathematics after the academic year 1969-70." (Emphasis supplied.)

This, too, was phrased as a recommendation to be passed up the chain of command for a final decision to be made at a higher level. The record describes the Dean of Faculty as the "chief academic personnel officer for" Oregon State, but does not tell us what his contributions were to the decision to discharge petitioner.

Confusion arises when we reach the University President level. The President's September 24 letter to petitioner stated:

"* * * [T]he executive office finds no sound academic basis for *reversing* the *recommendation* of the School of Science. * * *" (Emphasis supplied.)

The same letter contained several references to "Dean Ward's decision." Also, at the March 1970 hearing before the Board's Academic Affairs Committee the University President said there had been a "delegation of responsibility" to Dean Ward, and that the real issue was whether he (the President) had been correct in not overturning Dean Ward's decision.

However, we find no basis for concluding Dean Ward or anybody else below the University President level had authority to make a final decision to terminate petitioner's employment. Significantly, the same analysis was in the Board's answer filed in the circuit court in this proceeding:

"* * * [R]espondent admits that it was within the scope of Dean Ward's authority to make *recommendations* to Acting University President

Young concerning petitioner's continued employment by University and it was within the scope of Acting University President Young's authority *to act* upon such *recommendation* unless such act should be disapproved by respondent * * *." (Emphasis supplied.)

Therefore, the statement in the President's September 24 letter that

"* * * we regard Dean Ward's letter of February 25, 1969, to you as a letter of timely notice of non-reappointment in accordance with the provisions of Section L-3-F of the Administrative Code of the Oregon State Department of Higher Education.",

had no basis in law. It was impossible for Dean Ward's February 25 letter to be "timely notice of non-reappointment" because under the Board's regulations Dean Ward did not have authority to make such a decision. It was the President's September 24 letter that was the actual notice of termination.

However, the President's September 24 letter was not adequate notice to terminate petitioner's employment before the end of the 1970-71 academic year. When June 1969 passed without petitioner's having been told his employment would be terminated effective June 1970 by somebody with authority to make that statement, he then had an entitlement to continue employment, based on the Board's regulations, until June 1971. The President's September 24 letter was sufficient notice to terminate petitioner's employment in June 1971; that letter was not sufficient notice to terminate petitioner's employment sooner than June 1971.

 Since the Board's regulations created an entitlement to continued employment until June 1971, the

Board was required by the constitution to accord petitioner a hearing when it sought to discharge him before that date. *See,* Part III, supra. Since a hearing was required by the constitution, the Administrative Procedures Act, ORS ch 183, required that the hearing should be a contested case hearing conducted in accordance with the requirements of the Administrative Procedures Act. *See,* Part II, supra.

In spite of petitioner's entitlement to continued employment until June 1971, the Board discharged him effective June 1970. It did not accord petitioner a proper hearing before doing so. The hearing before a committee of the Board in March 1970 did not comply with the requirements of the Administrative Procedures Act. Just as one example, cross-examination was not permitted in violation of ORS 183.450 (3) (1969).

In summary, the Board's June 1970 discharge of petitioner was in violation of his constitutional right to a hearing before being deprived of his property interest in continued employment until June 1971, and in violation of his statutory right under the Administrative Procedures Act that such a hearing be conducted in accordance with that statute.

 There remains the question of an appropriate remedy, an issue on which the copious briefs before us are not very helpful. Normally, a public employe discharged in a manner that violates the employe's rights to a pretermination hearing would be entitled to reinstatement. *Greene v. Howard University,* 412 F2d 1128 (DC Cir 1969). But reinstatement would only be for the period of the employe's entitlement to continued employment under relevant statutes and regulations. Here petitioner's entitlement to continued em-

ployment ended in June 1971. Since that date has long since passed, reinstatement is not the appropriate remedy in this case.

 Instead, it appears that petitioner is entitled to money damages in the form of what his salary would have been for the 1970-71 academic year less the amounts he did earn or reasonably could have earned during that period. *Zimmerman v. Minot State College,* supra. This would be the natural result of application of the principle that the victim of an unconstitutional act is entitled to be restored to that which he lost. *Cf. Bivens v. Six Unknown Fed. Narcotics Agents,* 403 US 388, 91 S Ct 1999, 29 L Ed 2d 619 (1971). However, as noted we have not had the benefit of full argument on the remedy issue, and there is no evidence in the record on petitioner's mitigation, i.e. what he did earn or reasonably could have earned during the 1970-71 academic year. Therefore, upon remand the circuit court will explore and, if necessary, hear evidence on the remedy issue. In the unusual circumstances of this case, we believe the circuit court has authority to do so under the terms of ORS 183.480 (6) (1969).<sup>®</sup>

## V

In summary, we hold: (1) The notice of termi-

---

<sup>®</sup> ORS 183.480 (6) (1969) provided:

"The review shall be conducted by the [circuit] court without a jury as a suit in equity and shall be confined to the record, except that, in cases of alleged irregularities in procedure before the agency, not shown in the record, testimony thereon may be taken in the court. The court shall, upon request, hear oral argument and receive written briefs."

Once a court of equity acquires jurisdiction, it can award complete relief. Ruby v. West Coast Lumber Co., 139 Or 388, 10 P2d 358 (1932). Even if equitable relief is denied, money damages can be awarded. Fisk v. Leith, 137 Or 459, 299 P 1013, 3 P2d 535 (1931).

nation of employment petitioner received was too tardy, under the Board's regulations, to terminate petitioner's employment effective June 1970; (2) therefore, under the same regulations petitioner had an expectation of continued employment until June 1971; (3) petitioner's expectation of continued employment was a property interest within the meaning of the Due Process Clause—he could not be deprived of continued employment until June 1971 without a pretermination hearing; (4) such a hearing had to comply with the requirements of the Administrative Procedures Act, ORS ch 183; (5) petitioner was not accorded a pretermination hearing that complied with the Administrative Procedures Act. Thus, to the extent that the circuit court affirmed the petitioner's discharge effective June 1970, that determination is reversed and remanded for further proceedings on petitioner's damages for the 1970-71 year. In all other respects the circuit court's decision is affirmed.

Affirmed in part; reversed and remanded in part.