Argued January 17, reversed and remanded April 11, 1977

# OREGON COLLEGE OF EDUCATION
# FEDERATION OF TEACHERS, OFT/AFT,
*Petitioner,*

*v.*

# EMPLOYMENT RELATIONS BOARD et al,
*Respondents.*

## (No. C-277, CA 7035)

562 P2d 552

[ 39 ]

Don S. Willner, Portland, argued the cause for petitioner. With him on the brief was Willner, Bennett, Riggs & Skarstad, Portland.

W. Michael Gillette, Solicitor General, Salem, argued the cause for respondents Employment Relations Board and Oregon College of Education. With him on the brief was James A. Redden, Attorney General, Salem.

Laurie K. Smith and Frye, Speer & Smith, P.C., Eugene, filed the brief for respondent American Association of University Professors.

Before Schwab, Chief Judge, and Lee and Tanzer, Judges.

SCHWAB, C. J.

Tanzer, J., dissenting opinion.

## SCHWAB, C. J.

This is an appeal from an order of the Employment Relations Board (ERB) certifying that no labor organization had been elected by the faculty members of the Oregon College of Education (OCE) to represent them in collective bargaining. The principal issue is whether ERB erred in counting a challenged ballot which, when counted, produced a tie vote.

Three labor organizations sought certification as the bargaining representative for the OCE faculty: the Oregon College of Education Federation of Teachers (AFT); the American Association of University Professors (AAUP); and the Oregon State Employes Association. Those three organizations and OCE executed a consent election agreement, approved by ERB, defining the bargaining unit and those eligible to vote in the representation election.

In the first election, held October 21, 1975, none of the three labor organizations received a majority of the votes cast. Accordingly, ERB scheduled a runoff election between the AFT and the AAUP, the two top candidate organizations. In the runoff election, held December 5, 1975, the AFT received 88 votes and the AAUP received 87 votes. There was also one challenged ballot. ERB concluded after a hearing that it should be counted. It was cast in favor of the AAUP. This meant the runoff election ended in an 88 to 88 tie. ERB treated this tie vote as a vote for no representation and entered the order described above. The AFT appeals.

The facts relevant to the challenged ballot are not disputed. It was cast by a person who, when an unexpected vacancy occurred, on September 29, 1975 assumed teaching responsibilities on a three-fourths-time basis. The person did not, however, receive a formal written offer of employment from OCE's president until October 2, 1975 and did not accept the offer in writing until October 11, 1975. The person was then added to the payroll retroactive to September 29.

The consent election agreement executed by the labor organizations and OCE provided in part:

"1. That the following is an appropriate bargaining unit:

"All employes of Oregon College of Education who hold academic rank and are regularly employed at .50 FTE [full-time equivalent] or more; excluding all positions properly excluded by law as supervisory or confidential employes.

"* * * * *

"4. That eligible voters are employes in the bargaining unit *employed* at the time of the election and *during the payroll period ending September 30, 1975*" (Emphasis supplied.)

There is no question that the person who cast the challenged ballot was a member of the bargaining unit as defined by paragraph 1 of the agreement. The problem is whether that person was "employed * * * during the payroll period ending September 30, 1975" within the meaning of paragraph 4 of the agreement.

■ This court is divided over whether this presents a question of labor law or contract law. Representation elections pursuant to consent election agreements are common. Annotation, 69 ALR2d 1191, 1193-96 (1960); Annotation, 36 ALR 2d 1177 (1954); 48 Am Jur2d 346-49, Labor and Labor Relations §§ 485-89 (1970). Labor law is germane to the extent of encouraging such agreements and providing that they cannot be contrary to the rights or duties created by labor law. Any remaining issues—such as the present one of interpreting the agreement—is a question of contract law to the same extent as the interpretation of any other type of agreement. Stated differently, we reject the position taken in the dissent that we should rely on doctrines from labor law such as determining whether the person who cast the challenged ballot had a stake in the outcome. A new OCE teacher hired on October 1, 1975 would have clearly had a stake in the outcome of the representation election; however, equally clearly under the terms of the consent election agreement that new employe would not have been entitled to vote.

[ 42 ]

■ Turning to the interpretation problem in this case, we hold that the person who cast the challenged ballot was not "employed * * * during the payroll period ending September 30, 1975." Oregon Administrative Rule 580-41-010(1) of the regulations of the State Board of Higher Education provides that "members of the faculty * * * shall be appointed by the presidents" of the respective colleges and universities. On October 1—after the agreed eligibility date—the dean sent a memorandum to the OCE president stating that he and the department head recommended the appointment of the person who cast the challenged vote and made further recommendations concerning academic rank and salary. On October 2 the OCE president wrote the person who cast the challenged ballot:

"The purpose of this letter is to make you an *offer* of a position * * *.

"Please let me know if the position is acceptable to you. Our two letters are necessary as a written record of the agreement." (Emphasis supplied.)

On October 11 the person who cast the challenged ballot responded:

"This letter is to notify you of my *acceptance* of the position * * *." (Emphasis supplied.)

It follows that the person who cast the challenged ballot was not an employe in the sense of having a possible cause of action against OCE for breach of contract before October 11. And conversely, OCE would not have had a possible cause of action against the person who cast the challenged ballot for breach of contract before October 11. Employment being a contractual relationship, the person who cast the challenged ballot was not an employe within the meaning of the consent election agreement before October 11.

■ ERB's contrary conclusion was based on a finding that the OCE president had delegated his appointing authority to subordinates and that the person who cast the challenged ballot was employed by those subordinates before the September 30 eligibility date. There is

no substantial evidence in the record to support ERB's finding of delegation. That finding is squarely contrary to the October 2 and October 11 correspondence between the OCE president and the person who cast the challenged ballot. All documents prepared by subordinates before September 30 were in the form of *recommendations* that the person who cast the challenged ballot *should* be employed.

■ Furthermore, we have previously interpreted similar State Board of Higher Education regulations to provide there is no authority to *discharge* below the university president level. *Papadopoulos v. Bd. of Higher Ed.,* 14 Or App 130, 173-76, 511 P2d 854, Sup Ct *review denied* (1973), *cert denied* 417 US 919 (1974). As we read the present regulations, there is likewise no authority to *hire* below the university president level.

In summary, the challenged ballot was improperly counted because the person who cast it was not eligible to vote within the meaning of the consent election agreement. ERB should have issued the appropriate certification that the AFT had been elected the bargaining representative of the OCE faculty.

Reversed and remanded.

**TANZER, J.,** dissenting.

I respectfully dissent from the holding of the majority that ERB erred in its finding that the challenged voter was employed by September 30, 1975. I believe the majority to be in error both as it holds that the voter was not an employe as a matter of law and that there was no substantial evidence of delegation by the appointing authority.

The majority holds as a matter of contract law that the parties to the agreement did not intend by the use of the word "employed" to refer to any person whose employment had not been made final by formal appointment by the president of the institution. There

is no evidence whatever in the record to support this or any other construction of the parties' intentions. Rather, the silence of the record and the lack of definition in the agreement indicates to me that the parties had no intention regarding a situation such as this because they had not thought of it and that their present alignment on the issue results from the outcome of the election rather than upon their intention at the time of signing the agreement.

Furthermore, it is inappropriate to determine the right of a worker to participate in representational decisions by divining the intent of the makers of an agreement to which she was not a party. It is the rights of the worker, after all, that the election process is designed to advance, and I do not believe that ERB erred by failing to exclude this worker from the election.

ERB held that the voter was employed by the cutoff date. That was a permissible conclusion as a matter of law. We tend to defer to the legal conclusions of agencies in the implementation of the laws which they are charged with administering, although the court retains final authority in matters of law. *Cf. Fairview Hospital v. Moore,* 28 Or App 637, 640-41, 560 P2d 671 (1977). In a case involving the similar issue of whether certain persons had a community of interest with members of the bargaining unit so as to render them "employes," the United States Supreme Court said in *Board v. Hearst Publications,* 322 US 111, 130-31, 64 S Ct 851, 88 L Ed 1170 (1944):

"In making that body's determinations as to the facts in these matters conclusive, if supported by evidence, Congress entrusted to it primarily the decision whether the evidence establishes the material facts. Hence in reviewing the Board's ultimate conclusions, it is not the court's function to substitute its own inferences of fact for the Board's, when the latter have support in the record. *Labor Board v. Nevada Copper Corp.,* 316 U.S. 105; cf. *Walker v. Altmeyer,* 137 F.2d 531 (C.C.A.) Undoubtedly questions of statutory interpretation, espe-

cially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the judgment of those whose special duty is to administer the questioned statute. *Norwegian-Nitrogen Products Co. v. United States,* 288 U.S. 294; *United States v. American Trucking Assns.,* 310 U.S. 534. But where the question is one of specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited. Like the commissioner's determination under the Longshoremen's & Harbor Workers' Act, that a man is not a 'member of a crew' (*South Chicago Coal & Dock Co. v. Bassett,* 309 U.S. 251) or that he was injured 'in the course of employment' (*Parker v. Motor Boat Sales,* 314 U.S. 244) and the Federal Communications Commission's determination that one company is under the 'control' of another (*Rochester Telephone Corp. v. United States,* 307 U.S. 125), the Board's determination that specified persons are 'employees' under this Act is to be accepted if it has 'warrant in the record' and a reasonable basis in law." (Footnotes omitted.)

This court has looked to decisions of the NLRB as helpful, though not controlling, in resolving labor controversies arising out of Oregon's public employe relations statutes where they are parallel to federal law. *Klamath Co. v. Laborers Inter. Union,* 21 Or App 281, 534 P2d 1169 (1975). The NLRB interprets the term "employe" broadly in order to effectuate the purposes of the National Labor Relations Act. It is not bound by technical concepts of the employer-employe relationship. *See,* e.g., *Chemrock Corporation,* 151 NLRB 1074 (1965).[1] ERB should be free to do the same. It should not be bound by our view of contrac-

[1] The NLRB has consistently held that in order to be eligible to vote an employe must be both employed and working on the eligibility date. *Roy Lotspeich Publishing Co.,* 204 NLRB 517 (1973); *Colecraft Mfg. Co.,* 162 NLRB 680, 689 (1967); *The Crossett Company,* 140 NLRB 667, 676 (1963); *Ra-Rich Manufacturing Corp.,* 120 NLRB 1444, 1447 (1958). In all of these cases the challenged ballot was cast by one who had been hired but had not yet commenced work on the eligibility date and in each case the challenges were upheld. It is clear from these cases that the NLRB considers actual, not theoretical, employment to be determinative.

tual intentions. In *N.L.R.B. v. Midwest Television, Inc.,* 370 F2d 287, 289 (7th Cir 1966), it is said that if the stipulation of the parties is free from ambiguity, then it is to be enforced pursuant to the intent of the parties, but "if a stipulation proved to be ambiguous as applied to particular employees," then general labor principles control. Here, general principles of labor law should control, ERB's application of them was reasonable, and we should defer to ERB's application of them.

The challenged vote was cast by an employe who assumed teaching responsibilities at OCE on a three-fourths-time basis, on September 29, 1975, one day before the end of the qualifying payroll period. Her employment had been informally arranged after negotiations and agreement between her and her department head, as is customary at OCE. She did not, however, receive a formal written offer of employment from OCE's president until October 2, 1975, and she did not accept the offer in writing until October 11, 1975. Upon receipt of her acceptance, she was added to the payroll retroactive to the date on which she had assumed teaching duties. Her name did not appear on the October 2 voters eligibility list prepared by the college pursuant to the election agreement, but OCE's president purported to add the employe's name to the eligibility list by letter to AFT and AAUP dated October 3, 1975. She did not vote in the first election.

ERB was authorized to find as a matter of labor law principles that the employe had become sufficiently engaged by the performance of work for promised compensation as a member of the bargaining unit so as to have employe interest entitling her to participate in matters of representation. In fact, she had assumed all of the responsibilities and was entitled to all of the benefits of employment within the qualifying payroll period. Therefore within that period she shared, with all other members of the bargaining unit, a common personal interest in the terms and conditions of faculty employment. In this sense, ERB could reasonably have

found, as it did, that she was employed as a member of the bargaining unit during the payroll period even though her employment was not formally confirmed by written contract until shortly afterward. In accord with the purposes of the public employe relations statutes and of the realities rather than the formalities of the situation, I would hold that ERB's conclusion that the employe was an eligible member of the bargaining unit was lawful.

Next the majority holds that there was no substantial evidence to show a delegation of authority from the president to the department head. The majority cites the administrative rule of the State Board of Higher Education, § 41.010(1), which provides that members of the faculty shall be appointed by the presidents of the institutions. It is true that there is no evidence in this case of a written delegation of that authority from the president to the department heads, but there is plentiful evidence that delegation is the practice and understanding of all involved persons and that the exchange of letters between the employe and the president is understood by all to be a formal act of ratification of an employment relationship which has already been established. Accordingly, the order makes this finding:

> "It has been the practice of President Rice to delegate authority for such hiring to Dean Kersh and a subsequent approval of the appointment is issued from the President's office."

The order cites as evidence this testimony from President Rice:

> "[Q.] In terms of employment of faculty members at Oregon College of Education, does it often happen that you do employ faculty members physically on the premises at dates earlier than the paperwork is completed from your office?
>
> "[A.] Very common, within a few days I have employed one person who actually went to work on the 15th of December. This is not at all uncommon.
>
> "[Q.] Now when they are employed at earlier dates and then the paperwork is processed, does their salary

[ 48 ]

start at the date that the paperwork is finally completed in accordance with the State Board of Higher Education Administrative Rules?

"[A.]   As far as we are concerned, the final salary decision is made in the Dean's office, though the Dean would be in consultation with the Chairman, and the Chairman may do the actual negotiating and come to an agreement with the faculty member.

"[Q.]   As you don't change salary amount?

"[A.]   I have a clear understanding with the Dean that I work with him on the certain overall budget, and he works within that. I do . . the President does not fix salaries.

"[Q.]   This is Dean Kersh?

"[A.]   This is Dean Kersh.

"[Q.]   So you've delegated that responsibility to him, essentially?   .

"[A.]   That's right, that's right."

President Rice acknowledged that the rule made him the authority for such appointments but consistently testified to the fact of delegation at OCE, e.g.:

"[Q.]   * * * [H]ave you acted * * * in a manner in which you felt or presumed the institution bound by offers of employment extended by Department Chairmen and Deans?

"[A.]   Yes."

In addition, all of the internal records and memoranda of the college indicate that all administrative personnel, including the president, treated the voter as an employe as of September 16 or 29, 1975:

■ In a letter dated October 3, 1975, purporting to add the name of the worker to the eligibility list, the president indicates that she was budgeted as beginning employment on September 16, 1975.

■ The October 2, 1975, letter of the president to the worker offering her the faculty position indicates that the correspondence was intended to be a mere formality. The letter states "our two letters are necessary as a written record of the agreement." The implication is

[ 49 ]

clear that there was already an agreement outstanding.

■ The notice of appointment of the worker indicates that her contract period began on September 29, 1975, and ended on June 15, 1976.

■ An academic personnel action request form, another type of internal memoranda, signed by the college president, the dean of the faculty and the department chairman indicates that the effective dates of the worker's employment were from September 16, 1975 to June 15, 1976.

■ A memorandum from the dean to the president on the subject of the appointment of the worker indicates that she had agreed to accept the faculty position commencing on September 29, 1975. That memorandum makes reference to the fact that the necessary application forms were being completed. A look at the application form indicates that those forms were completed on September 30, 1975. Although there is no date on the memorandum from Dean Kersh, this internal reference indicates that the memorandum was sent to President Rice prior to September 29, 1975. Therefore the president had notice of the fact that she was commencing her employment prior to the date that she began teaching.

There is more than substantial evidence from which to find that the challenged voter was an employe, regularly hired and regularly performing remunerative duties by the date of the election. She clearly shared a community of interest with her fellow employes sufficiently to enable her to participate in decisions regarding representation.

Had the court concurred in my analysis that the vote should be counted, the tie vote would stand and the next issue would be whether a rerun of the runoff

election is required.[2] Since that issue is moot under the majority analysis, I shall deal with it more briefly than it deserves.

The board initially ordered a rerun, but, upon OCE's petition for reconsideration, it withdrew its order and directed certification that no organization had been elected. The order was entered pursuant to OAR 115-13-070(4), which concludes:

"* * * If there are only two choices on the ballot and the balloting results in a tie vote, the executive secretary shall certify that no representative has been chosen."[3]

I would hold that the refusal of ERB to order a rerun is contrary to the intention of the legislation it implements. By the same token, OAR 115-13-070(4), as it restricts runoff elections between candidate labor organizations to one after an election for representation has been made, is either invalid or invalid as it applies to Higher Education elections.

The collective bargaining rights of public employes are controlled by ORS 243.650 to 243.782. It is a primary purpose of those statutes to furnish a uniform means of providing labor representation to those employes who desire it. ORS 243.656(5) provides:

"It is the purpose of ORS 243.650 to 243.782 to obligate public employers, public employes and their

---

[2] The NLRB defines a vote between top contenders in a previous vote as a runoff. It defines a repeated vote between two top candidates as a rerun. NLRB Field Manual § 11350.

[3] It is questionable whether this rule was intended to regulate Higher Education elections at all in light of its beginning sentence which refers to non-Higher Education election procedures:

"Voting shall be by secret ballot and shall present an opportunity to vote for any one of the candidates on the ballot or for no representation."

Furthermore, the order also notes the consistency between its rule and the NLRB Rule 102.70 which similarly provides that only one runoff election is to be held, but harmony with NLRB procedure is irrelevant where, as here, the election law is not parallel to the National Labor Relations Act. Under the special procedures for Higher Education under ORS 243.686(6), which provides for a bifurcated ballot, the decision for representation had already been made. The only remaining issue was by which organization representation is to be provided.

representatives to enter into collective negotiations with willingness to resolve grievances and disputes relating to employment relations and to enter into written and signed contracts evidencing agreements resulting from such negotiations. It is also the purpose of ORS 243.650 to 243.782 to promote the improvement of employer-employe relations within the various public employers by providing a uniform basis for recognizing the right of public employes to join organizations of their own choice, and to be represented by such organizations in their employment relations with public employers."

ORS 243.686, which sets forth procedures for representation elections, was enacted to effectuate that purpose by providing a fair, orderly and expeditious means of determining representation. It should be administered and interpreted in accordance with that purpose. As the administrative body responsible for the conduct of representation elections,[4] ERB is authorized to act in a manner reasonably calculated to further the legislative purpose. The function of the court is not to pass upon the wisdom of ERB's action, but to determine whether it is taken in furtherance of the legislative purpose. If the action is not in any reasonable sense in furtherance of the statutory purpose, then it is beyond the scope of the agency's authority and must be set aside. *See* 4 Davis, Administrative Law § 30.05 at 215 (1958).

The facts of overwhelming legal import in this case are that three years have now passed since AFT petitioned for certification, that a year and half has passed since the OCE faculty voted by more than 2-to-1 for representation by one of the candidate organizations, and that they still are not represented.

---

[4] ORS 243.682(3) provides:

"Except as provided in ORS 243.692, if [ERB] finds in a hearing conducted pursuant to subsection (2) of this section that a question of representation exists, it shall conduct an election by secret ballot, at a time and place convenient for the employes of the jurisdiction and also within a reasonable period of time after the filing has taken place, and certify the results thereof."

ERB is also authorized to adopt rules in order to facilitate its conduct of elections. ORS 240.086(3).

There is no reasonable way to conclude that the legislative purpose of guaranteeing a fair, orderly and expeditious means of providing labor representation to public employes who desire it has been furthered.[5]

The purpose of an election is to elect, i.e., to make a choice between alternatives. The purpose of a runoff election is to make a choice between alternatives by successive balloting where the preceding vote failed to do so. ORS 243.686(6)(c) provides:

"* * * If no labor organization receives a majority of the votes cast * * * a runoff election shall be conducted. * * *"

While the statute is not explicit regarding the number of successive votes, the requirement that a runoff election be held indicates a legislative preference not to be satisfied with a vote producing a tie when a majority decision can be achieved by another vote. The term "runoff election" is not necessarily limited to one balloting. Indeed, the word "election" implies not merely an event at which votes are cast, but a process which culminates in a decisional result, i.e., an election between alternatives.[6]

There may be situations where due to the small number of voters (e.g., a 1-to-1 tie vote) or a succession of identical tie votes by a larger number of voters, it would be unreasonable to expect another balloting to

[5]Two members of the Board, Chairman Bailey and Mr. Adamson, dissented stating aptly:

"This case had its beginning in a Petition for Certification in 1974. The protracted and tedious route followed cannot now be justified by the decision of the majority. This is merely further frustration of collective bargaining.

"The Employment Relations Board has failed to cure these delays in representation cases. The result, which dismisses this representation case after more than two years of pendency before the Board, does not sustain its obligation established by statute to 'promote the improvement of employer-employe relations.' "

[6]Webster's Third New International Dictionary provides these preferred definitions of "election":

"* * * [T]he act or process of electing * * *, the act or process of choosing a person for office, position, or membership by voting * * *, an instance of the electorate's exercising its function * * *."

produce a different result. Such an inference would be within the reasonable discretion of ERB and, if it is drawn, it would be reasonable for ERB to declare a deadlock, for ERB need not require acts which it reasonably anticipates would be useless.

This is not such a case. Where there is a large number of eligible voters, it is unreasonable to assume the likelihood that another runoff election would produce the same result. There are too many human variables, e.g., voters leave town or return, they get sick or sick ones heal, they remember or forget to vote, nonvoters are motivated to vote by the closeness of the prior runoff, they change their minds. The only reasonable expectation is that a decision would be the likely result of a rerun, and decision is the purpose of any election process.

Therefore, I would construe the phrase "runoff election" as used in ORS 243.686(6)(c) to refer to the process of election by successive balloting until a decision is achieved. Implicit in such a construction, however, is the understanding that the Board need not order a rerun where it determines from the circumstances that it is unreasonable to expect that a decision would be achieved thereby. Accordingly, I would hold that OAR 115-13-070(4) either does not apply or is invalid as it restricts representational elections within the State System of Higher Education pursuant to ORS 243.686(6).

Therefore, I would reverse the order requiring certification of no election with instructions to complete the runoff election process. On that basis, I dissent.